THE WADLEY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 26830. Promulgated September 14, 1951.

*Patrick J. Smith, Esq., Russell J. Ryan, Jr., Esq.,* and *Perry E. O'Neal, Esq.,* for the petitioner.
*Lester M. Ponder, Esq.,* for the respondent.

**OPINION.**

RAUM, *Judge:* It is true that petitioner's average base period net income was lower than its average net income for preceding years; but that fact alone does not entitle it to relief under section 722. *Trunz, Inc.,* 15 T. C. 99, 103. It must go further and show that it comes within one of the provisions of section 722, and petitioner does contend that its average base period net income is an inadequate standard of normal earnings by reason of one or more of the factors set

forth in subsections (b) (2), (b) (3) (B), and (b) (5). Pertinent provisions of section 722 are set forth in the margin.³

In petitioner's original applications under section 722 it sought relief under (b) (2) and (b) (5); it urged that the "extremely heavy stock of dressed poultry in storage in December, 1936, resulted in a depressed market at the end of 1936 and materially affected the size of the poultry crop produced in 1937, 1938 and to a lesser extent in 1939" and stated that profits in the industry of which it was a member "are governed to a large extent by the crop of chickens raised and marketed each year, and to a lesser extent to [sic] the quality of dressed poultry which is held over in cold storage from one year to the next." In an amended application it also sought relief under subsection (b) (3) (B), stating that the industry of which it was a member was affected by sporadic poultry production by farmers and poultry growers which was characterized by a sharp drop in production after one or two years of increased production, that the general tendency was for its profits to be up in years of increased production and down in years of reduced production, and that the periods of

---

³ SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. ·In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except * * *.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

    \*        \*        \*        \*        \*        \*        \*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry.

(3) the business of the taxpayer was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to

    \*        \*        \*        \*        \*        \*        \*

(B) sporadic and intermittent periods of high production and profits, and such periods are inadequately represented in the base period,

    \*        \*        \*        \*        \*        \*        \*

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

    \*        \*        \*        \*        \*        \*        \*

sporadic profits were inadequately represented in the base period years.

To prevail under section 722 (b) (2) it is incumbent upon petitioner to prove that its business or the business of the industry of which it was a member was depressed during the base period; that the depression of the business was caused by a temporary economic circumstance; and that this circumstance was "unusual in the case of the taxpayer" or of its industry. See Regulations 112,[4] sec. 35.722–3; cf. *Lamar Creamery Co.*, 8 T. C. 928, 938.

Petitioner does not contend that there were any temporary economic circumstances in relation to its non-poultry business that rendered

---

[4] Regulations 112, section 35.722–3 :

(b) *Business depression in base period on account of temporary economic circumstances.*—If the taxpayer establishes that its business was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which the taxpayer was a member was depressed by reason of temporary economic circumstances unusual in the case of such industry, the average base period net income of the taxpayer shall be considered to be an inadequate standard of normal earnings. For the purposes of this subsection a business shall be considered to be depressed if it realized low earnings or operating losses which resulted from such factors as a low volume of output of products or services, from a low volume of sales, from high manufacturing costs, from low sales price, or from a combination of such factors.

Only those economic circumstances which were temporary in the sense that they had little perceptible effect upon the long run prospects of a business, and which affected the taxpayer alone or an industry of which it was a member as distinguished from those economic events which were of a chronic or continuing character or which affected business in general, may furnish a basis for a claim for relief under section 722 (b) (2). An economic circumstance is temporary depending upon the character and nature of such circumstances rather than upon the mere length of time of its existence. Thus, the income of a declining business or industry which was depressed throughout the base period because of economic conditions of a chronic and continuing character which may be expected to depress the earnings of such business for an indefinite period is not an inadequate standard of normal earnings under section 722 (b) (2). * * *

High costs of production because of high costs of material, labor, capital, or other elements of production, low selling price of the finished product, low volume of sales due to a low demand for such product or the taxpayer's output, or other ordinary economic hazards to which business in general is subject and which have the effect temporarily of depressing income are ordinarily not sufficiently unusual economic circumstances to constitute income an inadequate standard of normal earnings under section 722 (b) (2). Such circumstances are to be expected during any preiod of normal earnings and are presumed to have been offset by counterbalancing economic circumstances causing higher than average profits in other years in the base period. Consequently, the presence of unfavorable economic factors during the base period years of a taxpayer is not unusual when the presence of such factors is usual in the case of an industry of which the taxpayer is a member, or if such industry is depressed, in the case of business in general for such years. Nevertheless unusual and temporary economic circumstances reflected in one or more of such factors may depress the business of the taxpayer substantially beyond the extent to which other members of an industry of which the taxpayer is a member are affected, or may depress the industry (including the taxpayer) substantially beyond the extent to which other industries are affected. In such case the presence of such circumstances is an adequate reason for establishing that actual average base period net income is an inadequate standard of normal earnings. However, the mere fact that the business of the taxpayer or of an industry of which it is a member, as the case may be, fluctuates widely under the impact of economic events or is operated at a lower level of earnings than other members of such industry or other industries, as the case may be, and thus is depressed to a greater degree by unfavorable economic conditions than such other members or industries does not of itself indicate that average base period net income is an inadequate standard of normal earnings. * * *

(b) (2) applicable. It focuses solely upon its operations in poultry as a basis for relief under (b) (2).

However, there is grave doubt upon this record as to the soundness of petitioner's indispensable major premise, namely, that the reduction in its total net earnings during the base period was attributable to a decline in profits in its poultry department during the base period. Thus, although petitioner's average annual net income for the base period ($90,192.67) was less than its average annual net income for the 10-year period ending 1939 ($99,088.85),[5] its average annual gross profits from poultry for the base period ($162,736.69)[6] was greater than its average annual gross profits from poultry for the same 10-year period ($159,043.33).[6]

The situation is brought even more sharply into focus by contrasting two of the base period years, 1937 and 1938, with two earlier years, 1933 and 1934. Petitioner's gross profits from poultry in 1937 and 1938 were $165,984.85 and $165,099.09, respectively, whereas its gross profits from poultry in 1933 and 1934 were only $143,295.70 and $155,924.31, respectively. But, in 1933 and 1934, petitioner's total net income ($128,983.26 and $125,975.33, respectively) was substantially higher than its total net income in 1937 and 1938 ($92,792.09 and $83,719.52, respectively).[7]

These facts raise strong doubts whether the decrease in the base period net income was attributable primarily or even in major part to petitioner's poultry business. The decrease may well have been due to one or more reasons extraneous to the poultry business. Indeed, the evidence suggests that shrinkage of profits in the egg business—not urged as a basis for relief under section 722—contributed in substantial measure to the decline in petitioner's net income.[8] For aught we know, other factors, unrelated to the poultry business, may have played a part also in lowering the level of petitioner's income.

We do not say that no part of the decrease in net earnings was chargeable to petitioner's poultry business. Thus, the year 1939

---

[5] Computed from table, p. 272, *supra*.

[6] Computed from table, p. 272, *supra*.

[7] A similar contrast is shown by comparing the base period with the preceding 4-year period. Thus, although petitioner's average net income for the 4-year period 1932–1935 ($106,877.16) exceeded its average net income for the 4-year period 1936–1939 ($90,-192.67), its average gross profits from poultry for the 1932–1935 period ($147,841.00) was less than its average gross profits from poultry for the base period ($162,736.69).

[8] Petitioner's gross profits in eggs in 1933 and 1934 were $95,701.44 and $55,685.82, respectively, as against gross profits in eggs in 1937 and 1938 in the respective amounts of $30,130.28 and $33,590.73. Thus, although petitioner's gross profits from poultry were higher in 1937 and 1938 than in 1933 and 1934, its gross profits from eggs were markedly lower in 1937 and 1938 than in 1933 and 1934. We are satisfied that the reduction in gross profits from eggs was a significant factor in the decline of petitioner's net income. Similarly, whereas the average annual gross profits from poultry for the base period exceeded the average annual gross profits from poultry for the 10-year period 1930–1939, inclusive, the average annual gross profits from eggs for the base period ($36,338.06) was less than the average annual gross profits from eggs for the 10-year period 1930–1939, inclusive ($41,799.43).

shows a decline both in petitioner's gross profits from poultry and in its total net income. Undoubtedly, some part of the reduction in petitioner's 1939 net income was attributable to the poultry business. But the base period is not to be divided into separate segments; it is a unitary period, and when that period is taken as a whole we are still left in doubt as to whether the poultry business was responsible for at least a major portion of the decrease in petitioner's net income for the entire period. The burden of proof was on the petitioner, and that burden has not been discharged. Certainly, it has not established, as it must, what adjustments should be made in its earnings by reason of the alleged depression in its poultry business during the base period, in order to arrive at "a fair and just amount representing normal earnings to be used as a constructive average base period net income." Section 722 (a).

Although, for the foregoing reason, we might well conclude this portion of our opinion relating to (b) (2) at this point, we nevertheless pause to consider petitioner's contention that two temporary and unusual factors depressed its poultry business in the base period, one forcing up its procurement cost and the other depressing the sale price of its product.

It argues that its procurement cost was forced up because live fowl from Indiana and Illinois commanded premium prices in New York and, although petitioner sold its poultry dressed, it was nevertheless compelled to pay higher prices to farmers for its poultry in order to meet the pressure of "live buying" in the Indiana-Illinois area for the New York market. We think that contention must fail, not only because petitioner is precluded from raising the issue, but also because it has not furnished satisfactory proof that its business was in fact depressed to any substantial extent in any of the four base years by reason of such "live buying."

Neither in its original nor in its amended claims for relief under section 722 did petitioner anywhere raise the point or submit facts to establish that its procurement costs were forced up by reason of the "live buying" pressure in the Indiana-Illinois area. In the circumstances, the point is not open to petitioner here. As was made clear in *Blum Folding Paper Box Co.*, 4 T. C. 795, 799:

The scheme of the statute is that applications for relief under section 722 are to be presented in full to the Commissioner, who handles them administratively and passes upon them in the first instance in an effort to settle them without suit. This means that the applications must set forth not only the grounds for relief, but also a statement of the facts which the Commissioner is to consider in support of the reasons given. Additions are made by amendments before the claim is acted upon by the Commissioner. The Tax Court merely reviews his final determination. See sec. 732 (a), I. R. C. The taxpayer may not, as here, file a superficial claim, leaving the Commissioner in ignorance of the possible factual support for the claim, and then, after the

resulting disallowance, come forward for the first time with the supporting statement of facts. That information is not a part of the application and consideration of it is beyond the scope of review by the Tax Court.

Cf. *Monarch Cap Screw Manufacturing Co.*, 5 T. C. 1220, 1229.

What was said in the *Blum Folding Paper Box Co.* case applies with even greater force here; for petitioner neither presented the facts to the Commissioner in this connection, nor did it even raise the point superficially. It is particularly important in section 722 cases that the issues and facts upon the basis of which petitioner seeks relief be presented in the first instance to the Commissioner. The facts in such cases are likely to be complex, and interaction of elusive economic forces must frequently be taken into account. The Bureau of Internal Revenue is equipped with staffs of investigators and economists, and the statute contemplates that such matters will be considered initially at the administrative level, where they may conceivably be disposed of without the need for litigation.

In any event, we think that petitioner has failed to establish facts in relation to the "live buying" issues that would entitle it to relief. In the first place, the testimony with respect to that issue related almost exclusively to "fowl" rather than to poultry generally. The testimony was that Indiana and Illinois "fowl" commanded premium prices in New York. There was no showing as to what percentage of petitioner's poultry business involved the purchase and sale of fowl. In fact, it was stated that the major source of its profits from poultry was its dealings in chickens, particularly roasters. To what extent any pressure on the "fowl" market would be felt in the prices to be paid for chickens was a subject on which petitioner presented no evidence. Moreover, whatever may have been the situation in relation to the pressures alleged to have been created by the New York demand for Indiana and Illinois fowl, there would be no basis for relief under subsection (b) (2), because there was nothing "temporary" or unusual about such condition. Witnesses, both for the taxpayer and the Government, were unequivocal in stating that there was nothing unusual about the demand for live poultry during the base period that made it any different from such demand outside the base period. Finally, the evidence is far from clear that petitioner in fact did pay higher prices for its poultry during the base period, and indeed the figures for 1939, petitioner's poorest year, indicate that the prices which it paid were, on the whole, lower than in previous years.

Nor has petitioner proved that there were any factors in the base period of a temporary or unusual character within the scope of (b) (2) which were responsible for diminution of its earnings from poultry by depressing the prices that it received for its product. The only factor relied upon by petitioner as having a depressing effect upon its selling prices is the high national storage of dressed poultry during

the base years. The evidence indicates that the amount of dressed poultry in storage in the United States during the years 1920 to 1939, inclusive, showed a steady increase during the last three or four months of each year and usually reached the annual high point in the early part of January, then steadily declined to the low point which was reached and maintained in the months of July, August, and September. The only difference in the base period years was that the amount of dressed poultry in storage in 1936 climbed to record proportions in the latter part of that year so that at the beginning of 1937 there were 188,000,000 pounds in storage, which was the highest point reached in any of the years 1920 to 1939, inclusive, and the low point reached in September and October of 1937 was not as low as it had been in prior years even though a greater amount was removed from storage during the first 9 months of that year than had been removed in any prior or subsequent year. The high points in January of 1938 and 1939 appear to have been normal when compared to prior years, with the exception of 1937, but the low points in these 2 years were higher than the average of prior years.

We think that the evidence as to storage, even if otherwise within the scope of (b) (2), is far from clear in establishing the reason for any reduction in earnings which petitioner may have suffered. The peak storage year was 1937. Yet petitioner's worst year in the base period in terms of total net income as well as gross income from poultry was 1939. Moreover, even as to 1937, while the New York quotations on dressed chickens and fowl appear to have been generally lower in the months of January to July than they were in the corresponding months of 1936, 1938, and 1939, such quotations from July to December, 1937, particularly toward the end of the year (the period when the greatest amount of chickens are sold) were generally higher than they were in corresponding months of the years 1936, 1938, and 1939. In the circumstances, we are unable to find that the storage of dressed poultry during the base period was a substantial factor in any decline of petitioner's earnings due to a reduction in the prices that it obtained for its poultry.

Indeed, the evidence indicates that there were economic forces other than high storage, or removal of large amounts from storage, that exerted pressure toward a reduction in prices and a narrowing of the margin of profit, particularly during the last of the four base years. For example, the late 1930's witnessed the sharply increasing competition from poultry coming into the consuming market from the Del-Mar-Va area. Nothing in the evidence suggests that such condition was temporary; it reflected the normal interplay of economic forces due to the rapid growth of a new and strong competing industry on the east coast, and such competition surely could not qualify as a

"temporary economic circumstance" within the meaning of (b) (2). Cf. *Lamar Creamery Co.*, 8 T. C. 928, 939; *Harlan Bourbon & Wine Co.*, 14 T. C. 97, 104–106. We conclude that petitioner has failed to make out a case for relief under (b) (2).

Petitioner contends that it is also entitled to relief under the provisions of section 722 (b) (3) (B).[9] In its amended application for relief it alleged that the "condition generally prevailing in the industry of which the Wadley Company is a member is that poultry production by farmers and poultry growers is sporadic, having usually a sharp drop in production after one or two years of increased production"; that it is "this sporadic production which is the basic cause of sporadic profits realized by the taxpayer as a processor * * *"; that in view of "the relationship established * * * between production and profits * * * the taxpayer is subjected to sporadic and intermittent periods of high production and profits"; and that "the periods of sporadic profits are inadequately represented in the base period years 1936–1939."

[9] Regulations 112, section 35.722–3, contain the following pertinent provisions with reference to section 722 (b) (3) (B):

(2) *Sporadic profits inadequately represented in the base period.*—* * * In case the taxpayer is subjected to intermittent periods of high production and profits, the prosperous years of the taxpayer will occur at irregular and unpredictable intervals, and may depend upon fortuitous combinations of advantageous circumstances, as for example the juxtaposition of a good crop and a good market. If the base period of the taxpayer does not include these prosperous years, its earnings during such period will not be an adequate measurement of average normal earnings.

Proof that a year of high production and profits did not occur during the base period is not of itself sufficient to establish that the base period did not represent a period of normal earnings. The actual average base period net income computed under section 713 (d) may approximate either the average earnings of periods of normal earnings, which include years of very high profits as well as years of low profits, or the average earnings for the entire experience of the taxpayer. Consequently it must be established not only that the base period did not include one or more years of high profits irregularly experienced by the taxpayer but also that the level of earnings for periods of average normal earnings which include such years or the level of earnings for the entire period in which the taxpayer was in existence is substantially higher than the level of earnings during the base period. Since the concept of normal earnings does not contemplate a fixed and inflexible amount but envisions a level of earnings which represents normal earning capacity of a business, the mere fact that actual average base period net income is less than an amount which might be determined by reference to some period claimed to represent normal earnings or by reference to an average of earnings over the entire economic life of a business does not establish that such average base period net income is an inadequate standard of normal earnings.

A taxpayer which claims to be a member of an industry in which conditions prevail which subject the taxpayer to sporadic and intermittent periods of high production and profits must establish that business depression was encountered during the base period because of such conditions. It must also establish that such conditions were not peculiar to it alone in the base period but were also present in the case of such industry.

A taxpayer does not establish eligibility for relief under section 722 (b) (3) (B) merely by showing that annual periods of high profits have occurred irregularly in the past experience of the taxpayer. Such periods of high earnings may have resulted from windfall profits or from unusual circumstances befalling the taxpayer, or an industry of which it is a member, and not as the result of normal conditions under which the taxpayer's usual operations are carried on. Only in case high earnings which have occurred in prior years are directly attributable to factors normal in the case of the taxpayer and of an industry of which it is a member, may such high periods of production and profits be considered grounds for relief under section 722 (b) (3) (B).

We think that there has been a complete failure of proof of these allegations. Thus, as shown by the chart, p. 276, *supra*, there has been remarkably little variation in the production of chickens in the United States during the 20-year period ending 1939. Similarly there has not been any wide variation in the amount of poultry handled by petitioner itself over the years; and to the extent that there was variation it is noteworthy that petitioner handled a greater amount of poultry during the base years than during any other consecutive 4-year period going back to 1924. See chart, p. 273, *supra*.

Petitioner apparently recognizes its inability to prove that there were sporadic and intermittent periods of high production *and* profits, and now contends in its brief merely that there were sporadic and intermittent periods of high profits alone that were inadequately represented in the base period. But we cannot eliminate the statutory requirement of "high production." The provisions of (b) (3) (B) are applicable only in the case of "sporadic and intermittent periods of high production and profits." There is no basis whatever for ignoring the "high production" requirement.

Moreover, even if attention is directed solely to profits, we think that petitioner has not established the existence of sporadic and intermittent periods of high·profits that are inadequately represented in the base period. Its net income for 1936, the first year of the base period, was higher than in any other year during the 10-year period ending 1939. It is true that there were several years of considerably higher profits during the 1920's. But we are satisfied that the experience in those boom years was not fairly representative of normal earnings, and unless such peaks as did occur in the 1920's could reasonably be expected to recur they have no place in a reconstruction of base period income on the ground that they are inadequately represented in the base period. And, in view of the diminishing spread between poultry prices in New York and the farm prices in Indiana and Illinois, it is apparent that petitioner was settling down to a lower normal level of profits in the 1930's, so that its experience in several of the boom years in the 1920's would be out of place in determining whether its base period income was depressed in relation to normal earnings.

Petitioner's final contention is that there are other factors affecting its business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period within the general provisions of section 722 (b) (5). However, it has presented no facts in support of this claim, and since it has not even identified such "other factors," we must hold that it is not entitled to relief under section 722 (b) (5).

Reviewed by the Special Division.

*Decision will be entered for the respondent.*