OPINION. Withey, Judge: Petitioner bases its claim for relief on sectioi 722 (b) (2), Internal Revenue Code. This section is set forth in the margin.[1] To prevail under this section petitioner must show that its average base period net income is an inadequate standard of normal earnings because its business was depressed or because the taxpayer’s industry was depressed by reason of temporary economic events unusual in the industry. It must, also, by competent evidence, establish a fair and just constructive average base period net income. Petitioner’s contentions are that the temporary economic depression of the industry is evidenced by (1) the disparity between the price of cotton goods as compared with the price of all commodities during the base period years; (2) the oversupply of raw cotton during the base period years and its depressing effect upon the price of cotton goods during the base years; and (3) “the character of the circumstances under which the oversupply of raw cotton was created as it relates to section 722 (b) (2).” The Court is unable to distinguish between the last two contentions as the evidence relating to both contentions is the same. We have therefore considered them together. Based on the Bureau of Labor Statistics, Wholesale Prices, the index of all commodities during the base period was 93.51 per cent of the 1922-1939 average while the price of cotton goods was 84.34 per cent of the 1922-1939 average, or a difference of 9.17 per cent. This small disparity is merely the ordinary fluctuation that can be found by examining the yearly index of prices of cotton as compared to other commodities. While being fully aware of the disparity of price between all commodities opposed to the price of raw cotton, it is nevertheless incumbent upon us to consider particularly the specific industry of which petitioner is a member, that is, the sheetings industry, Southern division. Regs. 112, sec. 35.722-2 (b) (8).[2] We compare the price of middling cotton to the price of narrow sheetings. The average price per pound of middling cotton went from 15.57 cents for the 1922-1939 period to 10.19 cents for the base period, a decrease of 5.38 cents or 34.55 per cent; at the same time the price per pound of narrow sheet-ings went from 26.06 cents for 1926-1939 to 23.59 cents in the base period, a decrease of 2.47 cents or 9.47 per cent. In other words, the price of middling cotton decreased 263 per cent more than the price of narrow sheetings. Thus, it can be seen that the price of finished sheet-ings is not proportionately based on the price of raw cotton and the crux of petitioner’s major premise is not sustained. Further, the cost of raw cotton was 60 per cent of the price of narrow sheetings in the long period (1922-1939) whereas the cost of raw cotton represented only 43 per cent of the price of narrow sheetings in the base period. This would indicate the textile manufacturer can obtain a higher profit when raw cotton is selling at a lower price. Petitioner further contends, as before stated, that the oversupply of raw cotton was unusual causing a decrease in the price of cotton goods and emphasizes the character of the circumstances under which the oversupply was created. Examination of Exhibit 8-H discloses a constant fluctuation in the production of commercial cotton during the 1922-1939 period. In 1922 production was 10,000,000 bales; by 1926, five years later, production was 18,000,000 bales; a decrease to 13,000,000 bales occurred in 1927; a rise to 16,800,000 bales in 1931 ; 1932 witnessed a drop to 13,000,000 bales; and 1934 a continuation of the downward trend to 9,500,000 bales. Production again rose to 18,400,000 bales in 1937 and dropped sharply to 11,600,000 bales in 1938. In Industrial Yarn Corporation, 16 T. C. 681, 689, we said: * * * It is not unusual for a cotton crop to vary in size from year to year. The fortuitous circumstances that 1937 may have produced a cotton crop of extraordinary size does not, of itself, create an abnormality in petitioner’s business of the character sufficient to bring petitioner within the scope of the cited section. * * * It must be remembered that petitioner is not a cotton grower. It is a manufacturer. The effect of the large cotton crop was to reduce the cost of cotton to petitioner but it did not reduce the necessary profit it had to maintain to keep in business. Its success depended on keeping its costs of production down. The price of the raw cotton was reduced by the large crop and the price of cotton cloth was in turn reduced but its mill margin during the base period was substantially maintained. The statements of petitioner’s condition evidence the fact that it did not overstock during the base period. Petitioner’s average base period inventory was $72,576 as against the 10-year average from July 31, 1931, to July 31, 1940, inclusive, of $72,814. In petitioner’s fiscal year ended July 31, 1938, when petitioner claims an abnormal crop, its inventory did not exceed its inventory for the two highest years, 1984 and 1935. For the base period years, ending July 31,1937 to 1940, the average cost of goods sold was 79.50 per cent of sales as compared to the 1921-1936 average of 89.42 per cent of sales. The 1937-1940 average of 79.50 per cent is almost as low as the lowest year in the prior period, namely, 1934 when the cost of goods sold was 79.14 per cent of sales. This shows petitioner had a higher gross profit and a lower cost of goods sold in the base period years which is contrary to petitioner’s contention that its industry was depressed. The carry-over chart shows that of the abnormal crop more than half was being held by the United States Government and others. The petitioner was still buying in proportion to production capacity and was not bound by reason of the large crop of 1937 to buy more than it wanted. While considering cotton production, we should not fail to observe the increase in mill consumption which shows petitioner’s industry was not depressed. At a time when the base period United States production increased 100,000 bales over the 1922-1935 average, the base period United States mill consumption increased 950,000 bales over the 1922-1935 average. Since petitioner is in the mill end of the industry, the above comparison shows a more favorable position for its phase of activity therein. Comparing the base period years to the long period of 1922-1939 we find mill consumption in 1936 was 125 per cent of the long period, 1937 was 91 per cent, 1938 was 108 per cent, 1939 was 122 per cent and the average base period consumption was 112 per cent of the long period. This further shows petitioner’s advantageous position in the base period. Lastly, petitioner must show that because of the temporary depression its actual average base period net income is an inadequate standard of normal earnings. Petitioner has not done this. It has, in lieu thereof, treated the base period as being comprised of separate yearly units, proof of a depression in any one of which entitles it to relief under section 722 (b) (2). We must, as stated in Wadley Co., 17 T. C. 269, treat all of the base period years as a unit, for in that case we said “the base period is not to be divided into separate segments; it is a unitary period * * Examination of the income statements for petitioner shows average sales for the base period of $626,199 as against sales from January 1, 1921, to July 31, 1940, of $454,636, an increase of $171,563 or 37 per cent over the long period. At the same time average net income during the base period was $72,626 as against an average of $18,998 for the 187/12-year period from January 1,1922 to July 31,1940, an increase of $53,628 or 282 per cent over the long period average net income even after substantial increases in officers’ salaries were allowed in a so called depressed period, the 1939 salaries paid to petitioner’s officers being twice the 1926-1936 average. The increase in base period net income above noted is also true as to nine other Southern sheetings mills, whose net sales for the base period were 99.3 per cent of the 1922-1939 average and whose base period net profit was 151.56 per cent of the 1922-1939 average. The same profit picture can be viewed by comparing the manufacturing corporations other than cotton textile with the cotton textile corporations. By so doing we see that the base period average net profit of cotton textile corporations of $25,500,000 was 174 per cent greater than the average net profit for the period from 1922-1939 of $9,287,000 of the cotton textile corporations. At the same time the base period net profit for other manufacturing corporations was only 25.05 per cent greater than the net profit for the long period of 1922-1939. We have made a detailed examination of the many exhibits presented by petitioner but fail to see that the effect of the large cotton crop in the year 1937 upon petitioner’s industry resulted in the temporary economic depression of petitioner’s business during the base period. U. S. Treasury Department Bulletin on Section 722 of the Internal Revenue Code (Nov. 1944), Part III, par. (B), p. 17.[3] It is, therefore, our conclusion that petitioner has not established its right to relief under section 722 (b) (2), for it would be completely disregarding the facts to find petitioner’s industry, the Southern sheetings mills, was depressed in the base period as compared to the average long term period 1922-1939. Foskett & Bishop Co., 16 T. C. 456; Winter Paper Stock Co., 14 T. C. 1312; Monarch Cap Screw & Manufacturing Co., 5 T. C. 1220; Fish Net & Twine Co., 8 T. C. 96. In view of the fact that petitioner has not proved its industry was depressed it is unnecessary to comment on petitioner’s constructive average base period net income reconstruction. Beviewed by the Special Division. Decisions wül be entered, for the respondent. SEC. 722. GENERAL RELIEF — CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME. ***•*•• (b) Taxpayers using Average Earnings Method. — The tax computed under this sub-chapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because— ******* i(2) the business of the taxpayer was depressed in the base period because of ■temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry, ******* SEC. 35.722-2. CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.— (6) Buies for determination. ******* (8) For the purposes of section 722 and of section 35.722-3 (6) and (c), no exclusive definition of the concept “industry” can be constructed. In general an industry may be said to include a group of enterprises engaged in producing or marketing the same or similar products or services under analogous conditions which are essentially different from those encountered by other enterprises. The mere similarity of product and marketing methods, however, is not enough of itself to comprehend taxpayers satisfying such conditions within the same industry. Factors such as geographical location, character and location of markets, availability and character of raw material supply, and other conditions under which operations are carried on must be considered. Regard may be had to trade custom and practice in determining whether a group of enterprises constitutes an industry. (B) Scope of Section 722 (b) (2). Since tlie economic circumstances giving rise to relief must be temporary and unusual, it is important that the taxpayer furnish evidence concerning the exact nature of the circumstances alleged. It is not sufficient that the taxpayer merely show a depression during the base period by comparing its earnings during this period with earnings in a prior period, accompanied by general allegations concerning hard times or unfortunate conditions. It is expected that for all industries and all taxpayers there will be fluctuations from year to year in their earnings experience. Such fluctuations are perfectly normal, and in fact occurred in the experience of corporations generally during the base period. The year 1938 was in general a year of poor profits, and it would be improper under section 722 (b) (2) to grant relief due to that fact. In some particular industries one or more of the other years of the base period were depressed because of usual and recurring circumstances. Thus, it is necessary that the circumstances alleged under section 722 (b) (2) be identified specifically as to character, causes, extent and severity, and that positive evidence be presented to show that they were both peculiar and temporary.