## N. Hess' Sons, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 29158.    Filed November 14, 1958.

*Hugh C. Bickford, Esq.*, and *Henry H. Elliott, Esq.*, for the petitioner.

*William T. Holloran, Esq.*, for the respondent.

## OPINION.

RAUM, *Judge:* Petitioner seeks relief under section 722 of the Internal Revenue Code of 1939, as amended,[2] because of a change in its

---

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive

capacity for production or operation consummated during and after the base period.

During the taxable fiscal years 1941 through 1946 petitioner computed its excess profits credits under section 714 (invested capital method) and was allowed credits ranging from $26,050.39 to $32,-476.43. Its arithmetical average base period income was $4,643.02. In order to be entitled to any relief, petitioner had the burden of establishing a constructive level of earnings for its last base period year which would result in a constructive average base period net income large enough to produce credits in excess of those based on invested capital.

At the beginning of the base period, petitioner operated two stores in Baltimore, one at 31st and Charles Streets which sold children's shoes and the other at 8 East Baltimore Street which sold ladies' and men's shoes. On February 22, 1937, petitioner opened a new store

and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in the cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital * * *. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 31, 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business, or

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

at 312–314 Howard Street which specialized in the sale of ladies' shoes. During the fiscal year ended January 31, 1938, when the Howard Street store had been in operation for approximately 11 months, petitioner's sales at its three stores amounted to $801,818.18. Two years later, when the Howard Street store had been in operation for approximately 2 years, petitioner's sales at its three stores during the fiscal year ended January 31, 1940, amounted to $804,569.56, or approximately $3,000 more than its sales in the first base period year in which the three stores were in operation. The failure of petitioner's stores to show any substantial increase in sales after the Howard Street store was opened was partially due to the fact that increases in sales of ladies' shoes at that store were largely offset by a correlative decline in the sales of such shoes at the Baltimore Street store. Petitioner's taxable net income of $17,991.16 for the fiscal year ended January 31, 1936, and $9,911.82 for the fiscal year ended January 31, 1937, declined to $5,459.74 for the fiscal year ended January 31, 1938. It increased to $6,242.31 for the fiscal year ended January 31, 1939, and declined to $3,544.20 for the fiscal year ended January 31, 1940.

In the face of this unimpressive record of net income during the base period, petitioner contends that it is entitled to a constructive net income of $50,818.16 for its last base period year, and a constructive average base period net income of $48,455.11. In arriving at constructive net income, petitioner used constructive sales of $1,012,731.33 for its last base period year and employed an operating profit ratio to sales of 13 per cent before officers' salaries and employee bonuses.

The petitioner made changes in the character of its business within the intendment of section 722 (b) (4) by reason of the opening of the new Howard Street store A building in February 1937 and its commitment to add B building thereto. These changes entitled it to a reconstruction of its average base period net income under the 2-year push-back rule. Petitioner's contention is that if these changes had been made 2 years earlier the sales of the Howard Street store for the last base period year would have been 50 per cent greater than its actual sales for that year. Its officers, Ned Hess and George B. Hess, testified to this effect and indicated that the opinion thus expressed was based upon loss of sales at the A store during the base period because of lack of capacity for storing shoes and for seating customers and because of the disruption of business during the period when alterations, incident to adding B building to A building, were being made.

Neither in its original nor its amended applications for relief under section 722 did the petitioner present facts to the Commissioner or indicate that it was claiming that sales were lost at its Howard Street store during the base period because of any lack of capacity *for housing or*

*storing* merchandise. On the contrary, in these applications the principal officers of petitioner stated under oath that during the calendar year 1939 the petitioner had adequate stores of merchandise.[3] In the circumstances, the claim that lack of storage capacity restricted petitioner's sales will not be considered for the first time in this proceeding. *Blum Folding Paper Box Co.*, 4 T. C. 795, 799; *Wadley Co.*, 17 T. C. 269, 281; cf. *Green Spring Dairy, Inc.*, 18 T. C. 217, 241.

Petitioner's application for relief did contain allegations that sales were lost at the Howard Street store because it did not have sufficient seating space to accommodate customers, and we are convinced that there is merit to these allegations. This case, however, is unusual in several respects, and we are satisfied on the entire record that the evidence presented does not warrant the granting of any relief.

As already noted, the construction of A building and the commitment to add B building at the Howard Street location are qualifying factors under section 722 (b) (4), and the taxpayer is entitled to have the 2-year push-back rule applied to its operations. However, the present situation is not typical of the one in which the push-back rule is generally applied. In the usual case, the taxpayer is given 2 more years in which to build up demand, goodwill and the like, and a determination is made with respect to profits from increased sales resulting from the hypothetical increased demand that would have been generated by the 2 additional years of experience. In contrast, the goodwill of the Hess shoe enterprise in Baltimore had been firmly established prior to the opening of the Howard Street store. When that store was opened in 1937, the public response was instantaneous, vigorous, and enthusiastic. Ned G. Hess, one of petitioner's officers and stockholders, testified that "practically from the day we opened our doors we were so overwhelmed by customers—and again I would like to say because of the foundation that our forefathers had laid down—that we were literally swamped." Normal demand was attained virtually at once upon the opening of the A building at Howard Street, and the use of the 2-year push-back rule would have had no appreciable effect upon sales if limited to a consideration of sales at the A building alone. But the essence of petitioner's claim is that its sales were limited by inadequate selling area and seating facilities at the A building; that if the 2-year push-back rule is applied to the B building (thus providing it with adequate space during the last 2 years of the base period), it would have attained a higher level of sales with an accompanying increase in profits; and that correction must also be made for losses or decreases in income arising during the transition of the retail ladies' shoe operation from the Baltimore Street store

---

[3] Thus, it was alleged that "[i]n the year 1939 although the taxpayer had adequate stores of merchandise available," sales were lost because of lack of seating space for customers.

to the Howard Street store, as well as for loss of profits sustained during the period in late 1939 and early 1940 when the B building was being made ready for unification with the A building.

We agree with petitioner's position as thus outlined, and if petitioner's excess profits tax credits had been computed on the income basis, it would certainly be entitled to relief. But its credits were not measured by income; they were determined upon the invested capital method. And in order to obtain relief, it was necessary for petitioner to establish a level of earnings, after making the necessary corrections and adjustments, that would result in larger credits than the ones actually employed. We think that even after the permissible correction of abnormalities, petitioner has failed to establish a sufficiently high level of earnings to justify relief. Some increases in sales would have resulted if the added capacity of the B building had been acquired 2 years prior to the end of the base period. But we do not agree with petitioner's officers that that increase would have been proportionate to the additional selling area and seating capacity provided by the B building or that it would have amounted to 50 per cent of the actual sales of the Howard Street store in the last base period year.

The Howard Street store was not selling at peak capacity throughout every day or every month during the base period. And obviously when it was not operating at full capacity it did not lose sales because of insufficient seating facilities. Moreover, even at the height of a peak day it is unreasonable to assume that every potential customer walked out of the store merely because she had to wait for her turn to be served. Undoubtedly, some customers did not wait, and for that reason we have found that sales at the Howard Street store would have been in excess of the stipulated sales figure of $452,182.39 if the B building had been added 2 years prior to the end of the base period. But it is our best judgment on the record that such sales (including correction for loss of sales during the period that B building was being added to A) would not have exceeded $553,000.

To be sure, two of petitioner's officers testified that in their opinion the actual sales would have increased by 50 per cent. But we think they were unduly optimistic in their estimates, and that our finding is more consonant with the facts before us.

The parties are in disagreement as to the method of determining profit upon the reconstructed sales. Petitioner insists upon an operating profit of 13 per cent of sales *before* officers' salaries and employee bonuses, proceeding upon the assumption that officers' salaries would remain constant and that only a comparatively slight upward revision would be necessary in connection with bonuses. But we find such reconstruction unacceptable for several reasons. In the first place, the use of a 13 per cent figure was based on earnings of the Baltimore Street and Charles Street stores for the fiscal years ended

January 31, 1936, to January 31, 1939, inclusive. The earnings of these two stores for the year ended January 31, 1940, and the low operating profit ratio of the Howard Street store in the base period, were disregarded on the theory that they did not reflect normal operating conditions. Petitioner's base period and pre-base period experience at its Baltimore Street store indicates that a substantially lower net profit margin on ladies' shoes, which were the principal product sold at Howard Street, was normal for petitioner's business. In the circumstances, the complete disregard of the operating profit ratio of the Howard Street store, and the use of earnings of selected stores during selected years in arriving at the 13 per cent operating profit ratio (before officers' salaries and employee bonuses) to sales, convinces us that that ratio does not properly reflect petitioner's base period experience.

Moreover, the assumption that officers' salaries would remain constant in the face of the increased earnings postulated by petitioner is highly unrealistic on this record. Petitioner was a closely held family corporation, and the evidence shows that over a long period of years officers' salaries were closely correlated either to net sales or earnings, with the result that a comparatively small amount of taxable net income would be left after payment of such salaries. We are not prepared to make the naive assumption that the hypothetical increase in sales and profits urged upon us by petitioner would not have been accompanied by a substantial increase in officers' salaries.

Finally, the record shows that 1.61 per cent was the highest ratio of net income to sales attained by petitioner during the base period, and this was achieved during the first year of that period prior to the opening of the Howard Street store. While sales volume increased after that store was opened, net income declined and the net income ratio to sales declined.

In petitioner's last base period year the actual sales of the Charles Street store were $64,256.08 and of the Baltimore Street store $288,-131.09. If to these amounts are added maximum reconstructed sales of $553,000 for the Howard Street store, the total sales of petitioner for the last base period year would be $905,387.17. Even if it be assumed that the ratio of net income to sales was 1.61 per cent, the maximum realized by petitioner during the base period,[4] and that it had abnormal expenses in its last base period year of approximately $6,000,[5] its total net income for that year would not reach $21,000 which would make its constructive average base period net income under $20,000 in accordance with indices employed by petitioner (and agreed to by respondent) for the base period years, and its

[4] This figure is also in excess of the ratio of 1.5073 per cent for the entire period beginning January 1, 1924, through the end of the base period.

[5] A review of the evidence relating to abnormal expenses occasioned by the shift of the ladies' retail shoe operation to the Howard Street store convinces us that such expenses could not have exceeded $6,000 in the last base period year.

excess profits credit less than $19,000. This falls short of the invested capital credits ranging from $27,398.70 to $32,476.43 allowed petitioner for the taxable years in issue.

After a careful consideration of all of the evidence, our conclusion is that excess profits tax relief under section 722 (b) (4) must be denied because petitioner has failed to establish an amount to be used as its constructive average base period net income which would produce excess profits credits for the taxable years greater than the credits based on invested capital allowed by the respondent.

Although petitioner has not waived its alternate claim that it is entitled to relief under section 722 (b) (5), its brief contains no argument relating to, or specific reference to, these provisions. Moreover, there is no evidence of any factors affecting its base period earnings other than those advanced in support of its claim under section 722 (b) (4). In the circumstances, we hold that petitioner does not qualify for relief under section 722 (b) (5).

Reviewed by the Special Division.

*Decision will be entered for the respondent.*