HUGUET FABRICS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7292. Promulgated December 29, 1952.

*Howe P. Cochran, Esq.,* and *Margaret F. Luers, Esq.,* for the petitioner.

*T. R. Wickersham, Esq.,* for the respondent.

536

OPINION.

HILL, *Judge:* The issue presented is whether the petitioner is entitled to any relief from excess profits tax for its fiscal year ended September 30, 1941, under the provisions of section 722 of the Internal

Revenue Code. In order to be entitled to relief under the statute, petitioner must establish (1) that the tax computed without the benefit of section 722 results in an excessive and discriminatory tax, and (2) what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income.[1]

Although the petitioner employed the invested capital method of computing its excess profits credit for the fiscal year here involved, it is entitled to employ the average base period net income method in computing this credit if that proves more beneficial. Accordingly, it is entitled to proceed under section 722 (b) of the Code. *Toledo Stove & Range Co.*, 16 T. C. 1125. It must prove, therefore, within the scope of section 722 (b), that its average base period net income is an inadequate standard of normal earnings.[2]

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that in the case described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

[2] (b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer,

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

(3) the business of the taxpayer was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to

(A) a profits cycle differing materially in length and amplitude from the general business cycle, or

(B) sporadic and intermittent periods of high production and profits, and such periods are inadequately represented in the base period,

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the

In support of the allegations that the respondent erred in denying petitioner relief from excess profits tax for the fiscal year here involved, the petition contains general allegations of fact which indicate that it is petitioner's position that such events occurred within its experience which qualify as one or more of the factors enumerated in each of the paragraphs (1) to (4), inclusive, of section 722 (b), and which constitute, within the purview of paragraph (5) of that section, factors other than those enumerated in paragraphs (1) to (4), indicating that petitioner's average base period net income is an inadquate standard of normal earnings. Petitioner also relied on all five paragraphs of section 722 (b) in its application for relief on Form 991.

From our examination of the record and briefs, however, it appears that petitioner's case has been developed in such a manner as to indicate that it has placed its main reliance on paragraph (4) of section 722 (b), and with respect to that provision of the Code it is petitioner's main contention that it changed the character of its business during its base period by going into a *new and different market* with a *new and different product*. Accordingly, we will first consider this contention.

Petitioner's base period extended from October 1, 1936, to September 30, 1940. Accordingly, within the meaning of section 722, it is entitled to rely on any change in the character of its business which took place prior to October 1, 1940. *Wisconsin Farmer Co.*, 14 T. C. 1021.

As our findings of fact indicate, while the petitioner did some experimental work with respect to the use of the newly developed nylon in the manufacture of broad woven nylon fabrics in the latter part of the calendar year 1939 and the early part of the calendar year 1940, until the last quarter of the last year of the base period the only fabrics it manufactured for sale to its customers were woven out of silk or a combination of silk and rayon yarn (it also manufactured a

capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 31, 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business, or

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

relatively insignificant quantity of novelty woolen items). Beginning in July 1940, however, petitioner went beyond the experimental stage in the development of nylon fabrics and actually produced nylon fabrics for sale to its customers during the last quarter of the last year of its base period. That petitioner took this step is established by the facts stipulated, which indicate the petitioner made its first purchase of nylon yarn in sizable quantities during that period (1,029 pounds in July, 1,684 pounds in August, and 2,037 pounds in September), and that its first sales of nylon fabric were made during the same period ($842.96 in July, $5,810.28 in August, and $10,346.45 in September).

The main elements of the alleged change relied on by the petitioner are that it manufactured and sold new nylon fabrics to new customers, manufacturers of ladies' brassieres and girdles, an outlet for its product which petitioner had never previously employed since its silk fabrics were not adaptable to such a use, and that it sold these fabrics to such manufacturers directly, thus eliminating jobbers' commissions, resulting in a higher selling price of these fabrics.

We have found as a fact that the petitioner commenced the manufacture and sale of fabrics manufactured from nylon in the last quarter of its last fiscal year of its base period ended September 30, 1940. This was, of course, a change; however, not every change is sufficient to satisfy the requirements of the statute. As we stated in *Wisconsin Farmer Co., supra*, at page 1028:

* * * While the statute does not completely define what shall consititute a change in the character of a business, we are willing to accept the general principles outlined in Regulations 112, section 35.722–3 (d), where it is stated:

A change in the character of the business for the purposes of section 722 (b) (4) must be substantial in that the nature of the operations of the business affected by the change is regarded as being essentially different after the change from the nature of such operations prior to the change. No change which businesses in general are accustomed to make in the course of usual or routine operations shall be considered a change in the character of the business for the purposes of section 722 (b) (4). * * * A change in the character of the business, to be considered substantial, must be reflected in an increased level of earnings which is directly attributable to such change.

The nature or character of a taxpayer's business is at all times subject to many changes which do not necessarily serve to increase the earnings of the business but which in fact may actually result in substantial losses. However, the occurrence of a change in the character of a taxpayer's business for the purposes of securing relief under section 722 is important only if the change directly results in an increase of normal earnings which is not adequately reflected by its average base period net income computed under section 713. It is clear that the critical consideration in granting relief to the taxpayer in such cases as *East Texas Motor Freight Lines, 7-Up Fort Worth Co.*, and *Lamar Creamery Co., supra*, was the fact that the change was deemed sufficiently important in the taxpayer's business, as reflected by the increase in its earning

capacity resulting from the change, to render its average base period net income inadequate as a standard of normal earnings for the entire base period.

Although it is not too clear from the record, we believe that the petitioner has established that there were some differences which its nylon fabric possessed which distinguished it from petitioner's silk or combination of silk and rayon fabrics. These differences were specifically referred to by petitioner's general manager as the "high elongation" and "expansion qualities" of the nylon fabrics. Such qualities were not inherent in petitioner's silk or combination of silk and rayon fabrics and these types of fabrics could not be used in the manufacture of brassieres and girdles. Attorney for petitioner argues in effect that, because of such a distinction, the nylon fabrics could not be, and therefore were not, competitive with the silk or the combined silk and rayon fabrics. The fact that the silk and rayon fabrics could not be used in the manufacture of brassieres and girdles or were not suitable for that purpose does not require the conclusion that the nylon fabrics which were suitable for such purposes could not also be used in the manufacture of various ladies' outer garments, the nylon fabrics being sheer chiffons, mousselines, and marquisettes, as were the silk, and combination of silk and rayon fabrics. If petitioner's nylon fabric was such that it could be used only for undergarments, the record certainly has not established such a fact.

The effect of petitioner's further argument, however, is that there exists another basis on which the proposition that it went into a new business rests, namely, that all of the nylon fabrics were in fact sold during the base period directly to the manufacturers of ladies' brassieres and girdles. Relevant evidence with respect to this point is contained in (1) several pages of a somewhat general and incomplete stipulation and (2) a very general statement of an interested witness, a person who was the general manager, vice president and a director of the petitioner during the taxable periods involved. The following testimony of this witness tends to establish petitioner's position:

Direct examination:

Q. Tell the Court whether or not the Huguet Corporation, the petitioner here, reached the decision to go into that field?

A. Oh, yes. They had reached the decision in the early part of 1940 that we wanted to go into that field. And we expressed our opinions to the DuPont Company, and we were working very closely with Mr. George Groh of the DuPont Company for the further development of these nylon fabrics in the bassiere and girdle trade.

Q. Did you go into that field?

A. Yes, sir. We did go into that after July of 1940.

Q. How did Huguet Company, the petitioner here, how did this petitioner sell its goods before this development?

A. Prior to the decision of manufacturing nylon fabrics, we had always sold our fabrics through jobbers, but in view of the market analyses that we had made and the close participation with the consumers of the fabric, we had decided

that we would want to merchandise our nylon directly to the cutters or to the manufacturers of brassieres and girdles.

Q. Was that any different than what you had been doing before?

A. Yes. It was a decided change from where we were paying in handling through a jobber a percentage for handling fabrics for us.

Q. Did you before September 30, 1940 market nylon fabrics directly instead of through jobbers?

A. Yes, we did, sir.

Cross Examination:

Q. When you say they you mean jobbers, you mean you eliminate their mark-up?

A. No, sir. In other words, they were not functioning as far as their selling method was concerned with regard to nylon fabrics. We were going direct to the consumer.

Q. By the consumer you mean the manufacturer of the garment?

A. The manufacturer of the garment. He was the consumer of our fabric.

\* \* \* \* \* \* \*

Q. Nylon, in fiscal 1940, was your business limited to sales for brassieres and girdles or other foundation garments?

A. Just to brassieres and girdles in that year, in the undergarment field.

We believe that this testimony may be summarized in a short statement to the effect that during the base period petitioner sold all its nylon fabrics directly to the manufacturers of ladies' brassieres and girdles. The testimony does not identify any such sales. Petitioner's counsel contends, however, that such testimony, coupled with the stipulation of fact that $16,999.69 of nylon sales were made, establishes his point.

Immediately there exists some doubt as to the accuracy of the above quoted testimony in view of the fact that the same witness testified that the petitioner was manufacturing a bolting cloth made of nylon during the base period and it would be a logical assumption that it must have had some outlet for this bolting cloth. Further confusion is added by the following testimony of the same witness brought out on cross examination:

Q. In other words, you sold nylon marquisettes?

A. Yes, sir.

Q. Nylon chiffons?

A. Yes, sir.

Q. And nylon mousseline, is that correct?

A. No. Yes, that is correct, in addition to the sheer fabrics for the undergarment trade. In other words, those fabrics were usable by the foundation garment field because of their inherent strength.

But even if the testimony of the preceding paragraph were not included in the record, it would appear to us that the testimony of this witness to the effect that *all* base period sales of nylon were made to the undergarment industry is worthless to establish petitioner's point if other evidence indicates that *some* sales were made to other parties. Accordingly, looking at the stipulation, we find petitioner's

sales for the fiscal years ended September 30, 1940, and September 30, 1941, listed as follows:

| | Total Sales | Stern & Stern | Goldenbro Fabrics Inc. | J. H. Kimball Inc. | Mann & Delaney Ben Mann Fabrics Corp. | Wm. Cohen Fabrics |
|---|---|---|---|---|---|---|
| **1939:** | | | | | | |
| October | $77,778.26 | $24,101.41 | $34,121.29 | $2,385.58 | $1,200.00 | $2,013.57 |
| November | 95,382.02 | 30,766.26 | 45,579.88 | 1,307.62 | 1,756.93 | 3,171.70 |
| December | 82,946.16 | 27,764.66 | 34,710.29 | 2,264.10 | 3,382.39 | 2,123.15 |
| **1940:** | | | | | | |
| January | 102,553.62 | 38,907.82 | 41,984.58 | 2,129.26 | 2,068.79 | 9,104.38 |
| February | 105,147.37 | 39,249.58 | 46,299.64 | 2,701.64 | 2,245.93 | 5,078.55 |
| March | 147,175.56 | 77,869.98 | 45,618.57 | 2,064.82 | 1,868.42 | 16,044.75 |
| April | 137,957.98 | 78,288.60 | 46,567.36 | 1,367.23 | 2,053.86 | 7,664.45 |
| May | 88,820.60 | 42,480.97 | 35,860.66 | 1,166.46 | 535.46 | 7,152.80 |
| June | 34,698.34 | 16,886.96 | 12,599.96 | 1,202.76 | 100.00 | (776.13) |
| July | 40,885.32 | 9,585.29 | 16,084.31 | 1,568.79 | 100.00 | (372.09) |
| August | 43,097.20 | 15,093.90 | 11,863.47 | 1,552.06 | 300.00 | |
| September | 90,939.50 | 43,898.17 | 28,118.91 | 500.72 | 622.79 | 8,579.25 |
| Total | $1,047,381.93 | $444,893.60 | $399,408.92 | $20,211.04 | $16,234.57 | $59,784.38 |

| | Total Sales | Stern & Stern | Goldenbro Fabrics Inc. | Nylon Bali Brassiere Co. Inc. | Nylon Maiden Form Brassiere Co. | Nylon Warner Bros. Bridgeport |
|---|---|---|---|---|---|---|
| **1940:** | | | | | | |
| October | $93,487.93 | $30,559.24 | $41,964.45 | $2,275.57 | $42.39 | $389.39 |
| November | 115,523.04 | 30,240.48 | 47,668.06 | 13,099.10 | 527.58 | 234.09 |
| December | 95,361.62 | 36,303.07 | 28,504.94 | 11,042.18 | 402.71 | |
| **1941:** | | | | | | |
| January | 134,045.80 | 73,846.29 | 43,962.47 | (3,733.09) | 834.67 | 3,662.69 |
| February | 150,249.60 | 71,756.53 | 51,362.63 | 7.20 | 3,747.21 | 4,725.48 |
| March | 191,139.49 | 109,048.39 | 50,776.53 | 1,324.91 | 6,917.73 | 3,538.86 |
| April | 226,776.34 | 123,641.15 | 58,411.28 | 2,473.86 | 11,492.28 | 6,296.70 |
| May | 175,126.05 | 70,953.40 | 41,766.92 | 5,060.33 | 14,361.12 | 11,226.32 |
| June | 105,082.78 | 47,103.18 | 23,061.77 | 3,302.65 | 10,866.38 | 3,019.76 |
| July | 127,233.06 | 65,044.90 | 26,173.61 | 1,667.49 | 10,177.39 | 4,824.73 |
| August | 212,513.13 | 74,284.32 | 61,225.93 | 10,417.84 | 11,738.40 | 8,516.75 |
| September | 226,765.49 | 92,799.27 | 52,518.99 | 16,227.49 | 16,953.08 | 14,906.03 |
| Total | $1,853,304.33 | $825,580.22 | $527,397.58 | $63,165.53 | $88,060.94 | $61,340.80 |

The petitioner's witness testified to the effect that prior to the time the petitioner manufactured and sold nylon fabrics all of its sales of all of its fabrics were made through jobbers and all these firms specifically set out as purchasers of the petitioner's goods in the fiscal year ended September 30, 1940, namely, Stern & Stern, Goldenbro Fabrics, Inc., J. H. Kimball, Inc., Mann & Delaney Ben Mann Fabrics Corporation, and Wm. Cohen Fabrics, were jobbers. In examining the total sales by months during the fiscal year ended September 30, 1940, we have compared the monthly sales listed with the total of the sales made to the named jobbers and find that from month to month anywhere from 2 to 35 per cent of the total sales listed are not accounted for by sales to the named jobbers. While it may be possible (as the manner in which the stipulation was presented certainly tends to indicate) that the stipulation was intended to show that all sales were made to the five jobbers and that the difference between the total of these sales and the total sales listed for each month may be the result of not including in

the total figures any sales adjustments, such as sales returns and allowances, it is probably more nearly correct that the difference is in fact due to sales to other customers, as petitioner's attorney contends. Accordingly, looking at the total sales of the five jobbers in September 1940, we find there exists between this amount ($81,719.84) and the total sales ($90,939.50) a difference of $9,219.66. However, the stipulation shows that during this month there were nylon sales of $10,346.45, which by basic arithmetic would mean that $1,126.79 worth of such sales would necessarily have been made to the five named jobbers, none of whom were manufacturers of undergarments. There is another consideration which adds to the improbability of petitioner's argument. During the first nine months of the fiscal year ended September 30, 1940, before the petitioner entered the nylon field, from 2 to 18 per cent of all of its sales of silk, silk and rayon, and woolen fabrics were made to jobbers other than those named in the stipulation (it having been established that all sales of all such fabrics were made to jobbers). Accordingly, giving the petitioner the benefit of a doubt and estimating that 2 per cent of its total sales for September 1940 were sales of silk, silk and rayon, and woolen fabrics to jobbers other than the named jobbers, the result is that no more than an estimated amount of approximately $7,400 could have been nylon sales made directly to the manufacturers of brassieres and girdles. Added to this is the fact that the stipulation does not show any nylon sales as having been made to specifically named manufacturers of brassieres and girdles until October 1940, after the termination of petitioner's base period.

The state of the record with respect to this important element of the alleged change is indeed confused, and the petitioner has not met its burden of proving that during the base period it embarked upon a new and different business. Furthermore, while the petitioner's general manager testified that by selling direct to undergarment manufacturers the payment of jobbers' percentages would be eliminated, petitioner has not established by the record that in actual practice the benefit of the elimination of any such commissions was not passed on in whole or in part to any of the manufacturers of brassieres and girdles in the form of reduced selling prices.

From the state of the record before us we can not make a finding that petitioner embarked upon a new business and adopted new selling methods with respect to this business, nor that any such enterprise was separate and apart from its silk and rayon business. Of course, there was a change in that the petitioner commenced manufacturing fabrics of nylon yarn during its base period, but the evidence is insufficient to establish that this change was substantial and that there was not more than a mere substitution of raw materials. In this respect there was

introduced insufficient evidence with respect to the cost of producing or the existence or extent of the market for the petitioner's nylon fabrics as compared with its silk and rayon business. In this respect what the parties may have stipulated concerning reconstruction is neither competent nor sufficient to establish such facts. Furthermore, petitioner must first show a qualifying change before the Court can consider reconstruction of base period income.

We must conclude from the state of the record in this case that insufficient evidence was introduced to establish the existence during the base period of a qualifying change within the requirements of section 722 of the Code.

Petitioner introduced no evidence with respect to any change in management or increase in capacity, nor has any issue been raised that it commenced business during or immediately prior to the base period and that such a fact affected its earnings. We hold that the petitioner has not shown the existence of any of the factors enumerated in paragraph (4) of section 722 (b).

With respect to petitioner's claim under the factors contained in paragraphs (1) through (3) and paragraph (5) of section 722 (b), the evidence indicates only that the petitioner's average earnings were very low during the base period, that it suffered a serious loss in 1938, and that its decline in earnings was due in large part to the competition from rayon fabrics and also to the fact that the demand for such luxury items as were manufactured from petitioner's fabrics was very low. As far as we can gather from the record the inroad made into the silk fabrics industry by rayon fabrics was a permanent one, not a temporary one, and rayon replaced part of the demand for silk.

Such evidence does not prove that there were any peculiar or unusual events in the experience of the petitioner either immediately prior to or during the base period, as required by paragraph (1) of section 722 (b), or that there were any temporary circumstances unusual in the case of the petitioner which depressed its business as required by paragraph (2) of that section, or what were the conditions which were generally prevailing in petitioner's industry as required by paragraph (3). We have repeatedly held that the mere existence of a low level of earnings during the base period is insufficient to qualify within the provisions of section 722. *Roy Campbell, Wise & Wright, Inc.*, 15 T. C. 894; *Trunz, Inc.*, 15 T. C. 99; *Foskett & Bishop Co.*, 16 T. C. 456. And likewise precluded is any consideration of paragraph (5) since no evidence was introduced relating to factors other than those enumerated in paragraphs (1) to (4). Cf. *George Kemp Real Estate Co.*, 12 T. C. 943.

Petitioner has not proved that the average base period net income was an inadequate standard of normal earnings as required by section

722 (b). Accordingly, we believe that there is no need for us to consider, nor purpose in a discussion of, a reconstruction of the base period earnings, and we hold that the petitioner is not entitled to relief from excess profits tax in accordance with the provisions of section 722 of the Code.

There is contained in the petition an assignment of error which reads as follows:

(c) The Commissioner of Internal Revenue erred in permitting the Internal Revenue Agent in Charge to usurp the duties and authority delegated by the Congress to the Commissioner of Internal Revenue.

In support of this assignment of error there was alleged in the petition the following facts:

(c) Congress delegated to the Commissioner of Internal Revenue the authority to determine relief under Section 722 of the Internal Revenue Code. Petitioner is informed and believes that the said Commissioner is permitting others to usurp the duties delegated to him by the Congress, in that he permits his servants and agents to deny relief under Section 722 of the Internal Revenue Code.

These allegations were denied by respondent's answer.

We do not fully comprehend the meaning of the above assignment of error. Apparently it is petitioner's position that the procedure employed by the respondent in denying it relief went beyond the provisions of the Code relating to excess profits tax relief. No evidence was introduced with respect to this allegation, nor was any mention of it made on brief. Accordingly, we consider it to have been abandoned by petitioner.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*