OPINION. Van Fossan, Judge: In the opinion reported at 23 T. C. 382, we concluded that petitioner had not demonstrated that it was entitled to a greater credit than that allowed by respondent. On reconsideration we now conclude that petitioner has established its right to a larger constructive average base period net income. In acting upon petitioner’s claims for refund, respondent concluded that petitioner’s extruded plastic strip constituted a new product which was profitable to the petitioner, and determined that petitioner was entitled to a constructive average base period net income of $29,204.23,[1] being an increase of $37,428 over petitioner’s actual average base period loss of $8,224. Petitioner contends alternatively for constructive average base period net incomes of $89,570.17, $99,080.85, or $107,349.10. Respondent’s position is that Henry Ford, Sr., had the final word in the operation of his company and it is not shown he would have sanctioned the use of a higher priced decorative strip on the entire Ford lines — Fords, Mercurys, and Lincolns — during the base period. It is established as a fact that in 1939 officials of the Ford Company advised petitioner that it would use the extruded strip on the entire Ford line if petitioner was in a position to produce in such quantities. Petitioner, however, had to limit itself to production for the Lincoln car only. It is further established that Ford would have used the strip during the entire base period had it been available. We know that Fo.rd was plastic-minded, and, although it would have been possible for Henry Ford, Sr., to have vetoed the use of this extruded strip, the probability of such action was not sufficiently strong to cause us to conclude that he would have done so. At the time it was actually introduced, there was an acceptance of the use of the extruded strip by the more directly concerned officials. We dismiss the conjecture advanced by respondent that, under the circumstances, Henry Ford, Sr., would have resisted the introduction of an item as comparatively insignificant as the strip in question. Our problem thus resolves itself to a proper reconstruction of petitioner’s constructive average base period net income in the light of this enlarged use for the extruded strip. Elaborate reconstructions have been submitted by the respective parties, none of which are deemed free from fault or not subject to valid criticism. Petitioner first started producing the new extruded strip in the fall of 1939 and from that time on supplied it for use on the Lincoln car. We have found as a fact that had petitioner had its product available earlier it would have sold the product for all passenger cars produced by Ford. We think it apparent that had petitioner made the extruded strip 2 years before it did so during 1939 it would have supplied the Ford production of approximately 734,000 Fords and Mer-curys and 21,000 Lincolns. The extruded strip used on the Lincoln sold for $1.01 per car during 1939. The Ford was a lower priced car and the strip for it would have sold for about 48 cents per car. The Ford-Mercury additional production would thus have caused sales of approximately $352,000. The Lincoln sales would have been about $21,000. How this additional production would have been reflected in increased income is somewhat more difficult to appraise. We know that during the last 6 months of the calendar year 1939 the new extrusion operation which was primarily for the Lincoln car was shown in petitioner’s financial reports prepared at that time as resulting in an operating profit of 29.3 per cent of net sales. These financial reports and balance sheets which are the source of such information were regularly and contemporaneously prepared by cost accountants to aid petitioner’s executives. However, because of intangible factors, we are deterred, on appraisal of the entire record, from making a direct application of the figure derived from these reports in order to ascertain the level of earnings at which petitioner would arrive by the end of its base period under the push-back rule. Petitioner has also reflected in its base period reconstructions the injection moulding of plastic knobs and escutcheons which it began manufacturing for Ford in 1937. As to this phase of the case we believe petitioner has failed to make a satisfactory showing of the crucial fact that sales of the injection mouldings resulted in a profitable operation, with increased level of earnings directly attributable to such a change. See Permold Co., 21 T. C. 759, 769, and Huguet Fabrics Corporation, 19 T. C. 535. In our judgment, upon a consideration of the entire record, including petitioner’s history of losses on its other operations and the possibility of decreased percentage of profits on the increased production, the level of earnings which petitioner would have reached at the end of its base period would be $60,000. The parties, on briefs, are in implicit agreement that the reconstruction should be related to the base period production of the Ford Motor Company. An application of such an index leads us to conclude that, as indicated in our findings, petitioner is entitled to a constructive average base period net income of $60,000. It is only happenstance that this computed figure is sufficiently close to the level of earnings at the end of petitioner’s base period that we are constrained to determine the constructive average base period net income in the same amount. The constructive average base period net income to be used for the fiscal year ended June 30, 1941, is subject, by reason of variation in the provisions of the applicable law, to a different mathematical computation. It may be determined with the computations of the decisions. Keviewed by the Special Division. Decisions will be entered under Buie 50, Adjusted for the fiscal year ended June 30, 1941, by reason of a difference in computation caused by the difference of the applicable law.