THE TOLEDO STOVE & RANGE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 4802, 27161, 27162.   Promulgated May 21, 1951.

*Harley A. Watkins, Esq.,* and *Richard H. Peters, Esq.,* for the petitioner.

*William J. Stetter, Esq.,* for the respondent.

OPINION.

TIETJENS, *Judge:* At the outset it is necessary to define the issues in this proceeding. On brief and at the hearing petitioner has insisted that all possible grounds for relief under section 722 were raised in the applications filed with the Commissioner as well as in the petitions filed with this Court. Respondent, on the other hand, has argued that petitioner is limited to claims under subsections (b) (2), (b) (3) (A), and (b) (4), and at the hearing orally moved that petitioner be so restricted. The motion was taken under advisement with leave given to argue on brief whether the Court could properly give consideration to petitioner's claims under subsections (b) (1), (b) (3) (B), (b) (5), and (c) of section 722.

The question is not without difficulty because of the inartistic manner in which the claims for relief and the petitions have been drawn. However, it is readily apparent that petitioner cannot properly make claim under subsection (c) since petitioner is entitled to use an excess profits credit based on income and so cannot in any event obtain relief under section 722 (c). *Roy Campbell, Wise & Wright, Inc.*, 15 T. C. 894. See also *Danco Co.*, 14 T. C. 276. Our consideration of any claim under 722 (c) is thus precluded.

Turning to subsections (b) (1) and (b) (3) (B), we find that while petitioner asked for relief thereunder in its claims for relief (Form 991) filed for the years 1942 and 1945, these issues were not raised in the petitions filed for those years and so are not properly before us. *Mutual Lumber Co.*, 16 T. C. 370. The same is true of the claim under (b) (5) which was raised neither in the claims for relief nor in the petitions.

Before discussing petitioner's specific claims, attention is directed to the general thesis underlying petitioner's contentions, namely, "that Section 722 (a) in and of itself provides for relief," and "that when you consider 722 (a) and 722 [(b)] (5) together, that it is really a problem for the Court to administer its equity function, if it has an equity function, * * * to determine what is a fair and reasonable earning * * * on which to determine the excess profits taxes of this taxpayer." (The quoted portions are from counsel's opening statement.) As we understand it, the effect of this argument is that petitioner could show itself entitled to relief simply by convincing the Court that it was subject to "an excessive and discriminatory tax" without showing that the tax was "excessive and discriminatory" as a result of one or more of the factors set out in 722 (b). We think petitioner misapprehends the scheme of the statute which has been construed by this Court to be that the existence of an "excessive and discriminatory" tax under subsection (a) must be established by showing the existence of one or more of the events specified in subsection (b) or (c), whichever is applicable. *Danco Co., supra; Acme Breweries*, 14 T. C. 1034, and cases cited therein.

We now consider petitioner's claim under section 722 (b) (2), that its average base period net income is "an inadequate standard of normal earnings" either because its business "was depressed in the base period because of temporary economic circumstances in the case of such taxpayer" or because taxpayer was a member of an industry "depressed by reason of temporary economic events unusual in the case of such industry."

On this claim respondent's primary position is that petitioner's business was not *depressed* during the base period within the meaning of section 722. On the other hand, petitioner's position seems to be

that because it had no earnings during the base period it *ipso facto* is entitled to relief. We look to the record and find that petitioner had an average annual loss of $2,402.92 during the years 1922 to 1939 and an average loss of $5,309.68 during the years 1936 to 1939. In the 18 years from 1922 to 1939 it had net earnings in only 5 years— 1922, 1923, 1925, 1928, and 1929. Its average annual loss in the 6 years preceding the base period was $19,729.20, substantially higher than the base period losses. The whole history, then, of petitioner in the years under consideration was one of loss, and the losses in the base period were by no means the worst of the lot. We have been cited to no cases and have found none where the Court has dealt with taxpayers under section 722 whose base period years have each shown a loss. This Court has, however, said that the mere fact that base period profits were not large would not necessarily mean that the business was depressed, particularly where large profits were not customary in the taxpayer's history, *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220, 1229, and, also, that a mere failure to maintain a given level of earnings does not establish a depression of earnings within the meaning of section 722. *Harlan Bourbon & Wine Co.*, 14 T. C. 97. See also *Winter Paper Stock Co.*, 14 T. C. 1312, and *Foskett & Bishop Co.*, 16 T. C. 456. It seems that the principles underlying those decisions are equally applicable here and that petitioner has not shown that its business was *depressed* in the base period so as to qualify for relief under section 722 (b) (2). Distasteful as it may be to petitioner, it is difficult to see how a taxpayer with such a persistent history of losses can successfully argue that its average base period net income, which also reflected a persistent series of losses, some of which were not as heavy as in previous years, furnishes an "inadequate standard of normal earnings."

At the risk of unnecessarily extending the discussion of petitioner's claim under section 722 (b) (2), even if petitioner were held to have shown that its business was *depressed* within the meaning of the statute, it still would be incumbent on petitioner to show that the depression was caused by *"temporary economic* circumstances" in its own case or such *events* in the case of its industry. This Court has heretofore approved in *Foskett & Bishop Co.*, *supra*, the following provision of the Bulletin on Section 722 of the Internal Revenue Code, part III, page 16, issued by the Commissioner on November 2, 1944:

The term "economic" includes any event or circumstance, general in its impact or externally caused with respect to a particular taxpayer, which has repercussions on the costs, expenses, selling prices, or volume of sales of either an individual taxpayer or an industry. Thus, not every event or circumstance which has an adverse effect on a taxpayer's profits may serve to qualify that taxpayer for relief under subsection (b) (2). First, the temporary and unusual character of the circumstance or event must be clearly established. Sec-

ond, the cause of the temporary depression must be shown to be external to the taxpayer, in the sense that it was not brought about primarily by a managerial decision. A taxpayer cannot qualify for relief under subsection (b) (2) because its earnings were temporarily reduced in the base period in conse-·quence of its own business policies, internally determined. * * *

The difficulty of discussing the negative aspects of a record is apparent and it is sufficient to say that this record contains no convincing evidence that either the petitioner's business or that of its industry was depressed by reason of temporary or unusual economic circumstances or events. We therefore hold that petitioner has not shown itself to be entitled to relief under section 722 (b) (2).

Petitioner also claims relief under subsection (b) (3) (A). This subsection provides that the normally computed excess profits tax is to be considered excessive and discriminatory if the taxpayer's average base period income is an inadequate standard of normal earnings because:

(3) the business of the taxpayer was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to

(A) a profits cycle differing materially in length and amplitude from the general business cycle * * *

To qualify under this section petitioner must show that in the base period its business was depressed by reason of conditions generally prevailing in its industry which subjected petitioner to a profits cycle differing materially in length and amplitude from the general business cycle.

We do not think petitioner has made the required showing. As pointed out in our discussion of the claim under subsection (b) (2) petitioner has not demonstrated that its business was depressed within the meaning of section 722 (b). But even if it had shown "depressed" business petitioner must fail because it has not shown that the depressed business came about because of conditions generally prevailing in the gray iron castings industry. The record contains nothing to show the profits experience generally of that industry. It does, however, contain the profits experience (1) of five representative competitors of petitioner which is indicative of conditions prevailing in petitioner's industry; (2) of all corporations in the United States; and (3) of the petitioner. A graphic presentation of this data shows that the profits experience of petitioner's five competitors follows very closely that of all corporations. Petitioner's profits curve shows no correlation with either. Furthermore, tables appearing in evidence in which this data has been converted to index numbers for the base period show that sales of petitioner's competitors were in excess ·of the long term average, the index being 108.1 as compared with the index 67.8 for petitioner. Also, petitioner's competitors and busi-

ness in general enjoyed better than average earnings during the base period, the indexes being 104.4 and 108.4, respectively, as contrasted with continued losses for petitioner.

From this data we conclude that conditions in petitioner's industry followed those of general business and were generally good during the base period and that whatever else may have influenced petitioner's profit cycle, it did not result from conditions prevailing in the industry. Petitioner has not shown itself entitled to relief under subsection (b) (3) (A).

We come now to the claim of petitioner which merits most consideration, namely, that within the meaning of subsection (b) (4) it changed the management of its business immediately prior to the base period and as a result thereof its average actual base period net income does not reflect normal operation for the entire base period of the business.

The statute does not define what constitutes a change in management. However, we accept the general principles stated in Regulations 112, section 35.722-3 (d), as follows:

The hiring of new key managing personnel or the adoption of materially new basic management policies by the old management resulting in drastic changes from old policies would constitute a change in the operation or management of the business.

We also think the explanation set out in the Bulletin on Section 722, part V (C) 1, page 50, as follows, is consonant with those principles:

In order to qualify as having a change in management, it is necessary for a taxpayer to show a change in key managing personnel or a change in basic management policies by existing management. There is no precise definition of key personnel. The controlling consideration is not the number of positions changed but rather the relation of such changes to the basic management policies of the business. A qualifying change would probably result from a change in a corporation's directorate that entailed a broad reorganization of management policies. The emphasis should be placed on a change in the policies of the business rather than on the change in personnel. Such policy changes must be definite, basic and identifiable; not vague, general or routine.

There is no presumption that a change in management will result in increased earnings. The taxpayer must clearly show that the increased earnings resulted from the change. A change in management which was effected during a period of business expansion, such as the year 1939, may not be related to an increase in earnings. General conditions may have been such that the increased earnings would have resulted even if there had been no management change.

The regulations envision a qualifying change in management as one resulting in "drastic changes from old policies." Such a change will usually be reflected in a demonstrable change in business operations. Generally, a taxpayer alleging a change in management should be able to demonstrate the validity of its contentions by showing some change or changes in its business operations which resulted from the change in management.

If relief is claimed because of a change in management, it may be recognized only with respect to those policies adopted and actually put into effect by December 31, 1939.

From a study of subsection (b) (4) and the foregoing principles it is apparent that every change in management does not qualify a taxpayer for relief. Such a change is only significant if it results in an increase in taxpayer's earning capacity of such importance that its actual base period earnings no longer constitute an adequate standard of normal earnings.

What happened in this case? George F. Metzger was petitioner's general manager from March 10, 1924, until January 1935. He was also petitioner's president from 1926 to 1936. In January 1935 he was succeeded by A. E. Bacon as general manager and Bacon was general manager all during the base period. Respondent concedes that this change in general managers might constitute a change in "key personnel" within the quoted portion of the regulations, but contends that the change did not result in any significant change in petitioner's "basic management" policies.

The facts convince us that respondent is correct. The change in general managers led to the construction of several shipping docks to replace one shipping dock, changes in physical layout to reduce walking distance of employees, better employee relations, and the regaining of a few old customers. But we cannot find from the record that these changes produced any significant change in petitioner's earnings. Each of its base period years still showed a loss despite the fact that the new management took over a full year before the base period began and it seems to us there was ample opportunity to demonstrate the effectiveness of the new policies during that period. Sales did increase, but we must remember that the years involved, with the exception of 1938, were years of increasing business activity generally and there is nothing in the record before us definitely connecting petitioner's increased sales with the new management. The facts also show a decrease in labor costs of petitioner, from 67.7 per cent of the cost of goods sold in the periods 1922 to 1939 and 1922 to 1935, to 67.4 per cent in the period 1936 to 1939. But this saving was of minor consequence. Based on the indexes included in our findings of fact we have also found that petitioner failed to maintain during the years 1937, 1938, and 1939 the position which it had achieved in 1936. Furthermore, if we look beyond the base period we find that in 1940 petitioner was still operating at a loss.

It is also open to serious doubt whether there actually was a meaningful change in management. True there was a change from one general manager to another. But all other key personnel so far as we know remained the same. The same directors have been at their posts for at least 25 years. The same family group that took over control in 1912 controls today. We think petitioner overemphasizes the significance of the change in managers.

All of these things cast doubt on petitioner's claim that the change in management in 1935 resulted in a higher level of earnings inadequately reflected in its average base period net income. We hold that the change in management relied on by petitioner is not such a change as would entitle it to relief under the provisions of section 722 (b) (4) of the Internal Revenue Code. *Roy Campbell, Wise & Wright, Inc., supra.*

Since petitioner has not shown that it is qualified for relief under any of the subsections contained in section 722 (b), no useful purpose would be served by discussing whether or not petitioner has submitted "what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income."

We find no error in respondent's action in denying petitioner's claim for relief under section 722.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*