MITCHELL & CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 26415. Promulgated April 20, 1953.

*John J. Sullivan, Esq.,* and *John J. Fitzgerald, Esq.,* for the petitioner.

*J. Nelson Anderson, Esq.,* for the respondent.

112

OPINION.

HARRON, *Judge:* The question is whether petitioner is entitled to any relief under sections 722 (b) (2), or 722 (b) (5), Internal Revenue Code. The pertinent provisions of section 722 are set forth below.[2]

---

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess pr fits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry.

* * * * * * *

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

The petitioner bases its claim for relief upon a theory which consists of several contentions which, summarized, are as follows: (a) petitioner contends that its potential customers are limited principally to the inhabitants of Haverhill; (b) that the inhabitants of Haverhill are, for the most part, dependent for their purchasing power upon the wages paid to them by the women's specialty shoe industry and related industries which are located in Haverhill, which comprise approximately 67 per cent of all Haverhill's industry; (c) that Haverhill's shoe and related industries have had a history of satisfactory machinery for the arbitration of labor disputes from 1918 until the present time except for the period 1929 to 1935, inclusive; (d) that as of the first day of January 1929, Haverhill's arbitration machinery completely broke down and was not effectively restored until the early part of 1936, and unsettled wage disputes caused severe strikes between 1929 and 1936, so that the shoe industry in Haverhill was unable to meet its contractual obligations and thereby earned a poor reputation among the normal and potential buyers of its products; (e) that this situation caused many manufacturers to move out of Haverhill, while others failed and went out of business, all of which caused wide-spread unemployment in Haverhill, and severe and abnormal reductions of the purchasing potential of petitioner's fixed class of customers; (f) that with the return of responsible labor leadership to Haverhill in 1936, arbitration machinery was restored and further strikes were substantially eliminated, but, nevertheless, the reputation of Haverhill's shoe industry for stability in meeting contractual demands was not fully restored until approximately 1939, the close of the base period; (g) that the abnormally depressed level of petitioner's base period earnings is attributable to the industrial unrest found in Haverhill in the period 1929 to 1935, inclusive, which condition of unrest constituted a temporary economic event unusual in petitioner's experience.

We understand petitioner's position to be, substantially, that the sequence of events summarized above began with the breakdown of arbitration machinery in Haverhill, and that this was a temporary economic circumstance unusual in the case of petitioner within the scope of section 722 (b) (2).

The parties agree that although petitioner is not a member of the shoe industry, the successful operation of its store depends, in large measure, upon the prosperity of the shoe industry in the city of Haverhill. The fluctuations in petitioner's gross sales over the years follow the same general pattern as the fluctuations in the total payroll of Haverhill's shoe and related industries. The fact that petitioner's base period earnings were indirectly rather than directly affected by the fortunes of the local shoe industry would not of itself disqualify petitioner from relief under section 722 (b) (2). However, there

rests upon petitioner the burden of proving that its sales were abnormally reduced by a temporary economic event unusual in its experience. *Industrial Yarn Corporation*, 16 T. C. 681; *Del Mar Turf Club*, 16 T. C. 749; *Wadley Co.*, 17 T. C. 269; *Granite Construction Co.*, 19 T. C. 163. See, also, E. P. C. 12, 1947–1 C. B. 80.

The respondent concedes that no well-defined system of arbitrating labor disputes was operative in Haverhill from 1929 to 1935, inclusive. The chief point of respondent's argument is, however, that the presence or absence of arbitration machinery during that or any other period was merely an isolated, incidental circumstance which could neither have avoided nor furthered the steady, permanent decline in Haverhill's shoe industry which had commenced in approximately 1923, and had continued through the base period.

The issue under section 722 (b) (2) involves determination, first, of what economic factors have caused petitioner's low base period earnings, and, second, whether these economic factors were temporary and unusual in the experience of the petitioner within the intendment of section 722.

After thorough examination of the voluminous record in this proceeding, we are unable to ascribe to petitioner's history of low base period earnings, the causative factor which it asserts.

We have found as a fact that the processes for abitration of labor disputes were inoperative in Haverhill's shoe manufacturing industry for a substantial period of time prior to the base period. We have also found, however, that the steady, continuous, and permanent decline of the Haverhill shoe manufacturing industry itself, which commenced at approximately the beginning of the present century and reached its lowest level during the base period years, was attributable, on the whole, to permanent economic factors.

The decline of shoe production in Haverhill was due principally to (1) the expansion of western markets; (2) the lower cost of production outside of Haverhill in consequence of Haverhill's relatively high, unionized wage scale; (3) the many and varied forms of inducement which competing localities outside of Haverhill offered to Haverhill shoe manufacturers in order to persuade them to move their site of operations; (4) the increasing tendency, because of the increased profits inherent in such a system, to manufacture shoes in large plants geared for high volume output, of the sort for which the small plants in Haverhill were ill suited, and (5) competition between 1928 and 1938 from low cost shoes imported from Czechoslovakia.

We are unable to trace any clearly defined or ascertainable effect upon Haverhill or its shoe manufacturing industry to industrial strife during the period of a breakdown in arbitration from 1929 through 1935. For example, there is no correlation between population trends

and the ups and downs of arbitration. The population of Haverhill reached a high of 53,884 in 1920, and it declined by 4,652 in 1925. However, during the entire 5-year period, a system of labor-management arbitration existed in Haverhill. Conversely, Haverhill's population decreased by 3,000 between 1935 and 1940 in spite of the resumption of arbitration on January 1, 1936. Furthermore, a total of 40 manufacturers moved out of Haverhill from 1936 to 1940, inclusive, a period of continuously available arbitration procedures for Haverhill's shoe industry.

Noteworthy, also, is the fact that, except for the year 1936, in which no strikes were reported in Haverhill, there were some strikes in every year from 1927 to 1940, inclusive. It is significant that, with the exception of major strikes in 1929, 1933, and 1934, man hours lost by reason of strikes were as great in the years preceding and subsequent to the breakdown of arbitration procedures in Haverhill, i. e., when arbitration systems were available to labor and management, as they were in the years when there were no arbitration procedures.

Testimony with respect to individual strikes merely serves to further illustrate the invalidity of petitioner's theory that arbitration spelled the difference between prosperity and poverty in Haverhill's shoe manufacturing industry. Mrs. Moran, a witness called by the petitioner as an expert on labor relations in Haverhill, testified as follows:

Q. And what provoked the strike in 1929?

A. Well, abuses can be as bad one way as they can the other, and the shoe workers felt they were being abused. And at this point there was a little bit of shoe business, and they thought they'd get back all they lost. So one Monday morning they organized a parade, and everybody was on the street and they stayed out.

Q. That was in '29?

A. '33.

Q. I'm talking about '29.

A. '29; that was to get the ten percent cut.

Q. Who provoked that?

By the COURT:

Q. What do you mean by ten percent?

A. Well, the manufacturers, in order to stay in business, claimed they needed a ten percent reduction in labor prices.

Q. In labor costs?

A. So they just closed the factories.

David H. Hilliard, one of respondent's witnesses, testified as follows with respect to a strike occurring in 1942 which lasted between 8 and 10 days:

Q. And do you recall anything about that particular strike?

A. Yes. United Shoe Workers Union had requested a general wage increase. The manufacturers could not see their way clear to grant the increase to them and it went to arbitration. They called Copelof, the Federal Arbitrator, who

was the arbitrator in the case. He handed down a decision that was unacceptable to the workers. They all just walked off the jobs, quit work.

The mere existence of one or more of the factors set forth in section 722 (b) (2) does not of itself entitle a taxpayer to relief. The petitioner must show that as a result of the existence of such factor its base period net income was depressed. *Clinton Carpet Co.*, 14 T. C. 581.

Therefore, even though arbitration in Haverhill did break down temporarily prior to the base period, petitioner's claim for relief under section 722 (b) (2) must fail in the absence of proof of causal relationship between that temporary economic factor and petitioner's low base period earnings. Petitioner has failed to establish such relationship.

We have found as a fact that petitioner's base period net income was low, but we have found, also, that its low earnings were due principally to low net sales. However, low base period earnings do not *ipso facto* entitle petitioner to relief. Such earnings must be shown to be subnormal earnings as a result of an event listed in one of the subsections of 722 (b). *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220, 1229; *Wadley Co., supra*, 269, 277; *Trunz, Inc.*, 15 T. C. 99, 103. Petitioner has failed to meet its burden in this respect.

We have given consideration to those economic factors which, based on the record, explain the decline which took place in Haverhill's shoe manufacturing industry. The issue as presented by the parties has made such consideration necessary. It should be pointed out, however, that the petitioner is a member of the retail department store business. While it is true that petitioner's economic success hinges substantially, if but indirectly, upon the fortunes of the local shoe manufacturing industry, it is equally true that during the base period petitioner encountered direct competition from two new competitors. The Sceva Speare Company operated its store at a distance of 300 feet on one side of petitioner's store, while Enterprise Stores was located only 300 feet on the other side. Both were operated by persons who were both experienced and successful in the retail merchandising business. Each made substantial sales during the base period. To what extent this new competition affected petitioner's sales has not been established. However, since petitioner has the burden of proving that this permanent economic factor—direct competition—did not adversely affect its base period sales, and since petitioner has failed to prove that the factor of direct competition did not cause its low base period earnings, the doubts in the matter must be resolved against the petitioner.

It is held that petitioner does not qualify for relief under section 722 (b) (2).

122

We come now to a consideration of petitioner's alternative claim for relief under section 722 (b) (5). Neither in its petition, nor at the trial of this proceeding, nor on brief has petitioner made clear whether it seeks relief under subsection (b) (5) on the basis of the same factors which have already been considered in connection with petitioner's claim for relief under section 722 (b) (2), or on the basis of some "other factor." Relief must be denied in either event. Relief cannot be afforded under section 722 (b) (5) where petitioner has not even identified the so-called "other factors." *Wadley Co.*, *supra*, 269, 285. If, on the other hand, petitioner's claim for relief under subsection (b) (5) is predicated on factors which we have separately considered and rejected, above, petitioner must fail. *Granite Construction Co.*, *supra; General Metalware Co.*, 17 T. C. 286; *Foskett & Bishop Co.*, 16 T. C. 456; *Roy Campbell, Wise & Wright, Inc.*, 15 T. C. 894; *George Kemp Real Estate Co.*, 12 T. C. 943. It is held that petitioner does not qualify for relief under section 722 (b) (5).

Reviewed by the Special Division.

*Decision will be entered for the respondent.*