950

MIDWEST LIQUOR DEALERS, INC., PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 26983, 29753.   Promulgated September 9, 1953.

*Philip B. Heller, Esq.*, for the petitioner.
*Julian L. Berman, Esq.*, for the respondent.

954

956

OPINION.

Raum, *Judge:* Petitioner contends that it is entitled to excess profits tax relief under section 722 (a) and 722 (b) (4) of the Internal Revenue Code,[6] by reason of (1) commencing business immediately prior to the base period; (2) changing its capacity for operation of its business by acquisition of larger warehouse facilities from which business could be operated more profitably; and (3) changing the operation of its business by engaging in the purchase of bulk whiskeys.

1. Petitioner maintains that it qualifies for relief under section 722 (b) (4) because it commenced business immediately prior to the base period and its average base period net income does not reflect normal operations for the entire base period. Petitioner began operations on April 10, 1935, and thus had slightly less than a full year of experience prior to the beginning of its base period. It is therefore entitled

---

[6] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that in the case described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \* \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 31, 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business, or

to relief on account of this commencement factor if the factor prevented the average base period net income from reflecting normal operations of the business for the entire period. The Government has taken the position that petitioner attained a normal competitive position almost immediately after starting business, and that its base period earnings were not adversely affected by reason of this factor. Accordingly, it opposes relief on this ground.

It is quite true, as the Government points out, that petitioner's sales position was better in the second base period year than in its last 2 base period years. And we think that petitioner would not have reached a higher level of sales during the last 3 years of the base period, or by the end of the base period, merely by commencing business 2 years earlier. The evidence is persuasive that the business was such that it did not require a long period for petitioner to attain normal operations. However, some initial development was required, and the formative stage had not yet been fully completed by the beginning of the base period. Petitioner's sales during the first half (April through September 1936) of its first base period year appear to be out of line, and we are satisfied that such condition was due to the fact that petitioner had not yet reached its stride.

Respondent opposes relief with respect to this factor on the further ground that even if petitioner had enjoyed a higher level of sales during the first 6 months, additional compensation to its officers would have wiped out any increased earnings. We do not agree. We think that petitioner would have had additional sales, had it commenced business earlier, and that such additional sales would have resulted in additional profits even after taking into account increased costs of operation. In determining petitioner's constructive average base period net income a correction will therefore be made in petitioner's earnings for the first half year of the base period by reason of the commencement factor.

2. Petitioner relies upon its acquisition of new warehouse facilities as a second ground for relief. We agree that the move into the new warehouse brought about a substantial change in petitioner's operations with resulting economies that are not reflected in its average base period net income. The new facilities made it unnecessary for petitioner to use outside public warehouses, thereby achieving a net savings through the elimination of the charges made by the public warehouses. Moreover, the use of public warehouses had entailed additional handling of the merchandise, since petitioner's trucks were required to transport the goods to the public warehouse in the first instance and then at a later time to transport them to petitioner's place of business when withdrawn from the public warehouse. Thus, the new facilities acquired by petitioner resulted in the reduction of use of petitioner's trucks as well as some savings in personnel. Also,

petitioner's new premises contained a United States Customs bonded warehouse which enabled petitioner to achieve savings on its purchases of imported merchandise.

We conclude that petitioner's move into its new warehouse was a change in the character of its business within the meaning of (b) (4), and our reconstruction will take into account the savings which were available to petitioner as a result of that move.

3. Petitioner contends that it changed the character of its business during the base period by entering into the practice of purchasing bulk whiskey from National Distillers, taking on National's entire line of bottled goods, and at the same time abandoning the Schenley line. The relief sought by petitioner is based upon a two-fold assumption: That if it had made this change 2 years earlier, then, first, it would have been able to sell 15,000 additional cases a year of the so-called contract brands, derived from its bulk purchases, and, secondly, that it would have been able to sell 15,000 additional cases a year of National's bottled goods.[7]

We must reject the second assumption on the evidence before us. As far as we know, National's bottled goods which are here involved represented established brands, and they merely replaced brands in the Schenley line which petitioner abandoned at the time it took on the National line. We are not satisfied that if petitioner had abandoned the Schenley line in favor of National 2 years earlier, it would have enjoyed any higher level of sales of National's bottled goods by the end of the base period. Thus, petitioner's sales of "Old Grand Dad" and "Old Taylor," two of National's most prominent established brands, were higher in its third base period year than its fourth, being 5,265 cases for the fiscal year ended March 31, 1939, and 4,580 cases for the fiscal year ended March 31, 1940.[8] No satisfactory explanation was given for the decline. Certainly, we are not convinced that if petitioner had embarked upon its program of dealing in National's merchandise 2 years earlier, there would have been any difference in its sales of National's bottled goods. Accordingly, even assuming that petitioner's acquisition of National's entire bottled line in place of the Schenley line could appropriately be considered for purposes of relief under (b) (4), we conclude that petitioner has failed to establish that its earnings attributable to sales of National's bottled goods would have attained a higher level by the end of the base period. In the circumstances, we must reject petitioner's position to

[7] In petitioner's reply brief it is asserted that it is not relying upon the abandonment of the Schenley line in favor of National's bottled goods as a separate claim for relief. Yet, its proposed reconstruction assumes additional sales of 15,000 cases of National's bottled goods, and the evidence suggests that this factor in some undefined way is related to petitioner's entering into the bulk whiskey field. In the circumstances, we deal with the point here.

[8] Other National items, apart from bulk conversions, showed an increase in sales from 19,897 cases to 20,834 cases in the last base period year over the preceding year.

the extent that it seeks a reconstruction containing additional earnings allocable to sales of National's bottled goods.

Petitioner's operations in relation to its bulk purchases present a different picture. The brands involved in these purchases required promotional activities extending over some 4 or 5 years before they could be regarded as established brands in petitioner's territory. We think that the type of operation revolving around the bulk purchases was so markedly different from petitioner's prior mode of doing business as to constitute a change within the meaning of (b) (4). However, our principal difficulty with this aspect of the case lies in the amount of relief sought by petitioner. We think that the estimates of additional sales by use of the 2-year push-back rule and the profits allegedly attainable from such sales are highly inflated.

Petitioner urges that by applying the 2-year push-back rule it would have increased its sales of contract brands from 5,000 cases a year at the end of the base period to 20,000 cases a year. Upon consideration of the entire record, we do not accept the latter figure as a reliable estimate. Moreover, the evidence before us persuasively establishes that the application of the 2-year push-back rule to petitioner's entering the bulk whiskey field would not have increased consumption of whiskey in the area which it served. Accordingly, any increase in the sale of contract brands would be at the expense of other brands, whether carried by petitioner or its competitors. Therefore, in order to determine the net effect upon petitioners earnings of any increase in sales of contract brands, such increase would have to be reduced by the adverse effect that it might have on other brands sold by petitioner. The state of the record is thoroughly unsatisfactory in this respect, but, doing the best we can with the materials at hand, it is our best judgment that if petitioner had undertaken its bulk whiskey program 2 years earlier, it would have had a net increase in sales of about 4,000 cases a year.

A further difficulty with the amount of relief sought by petitioner is its assumption that there should be included in reconstructed earnings, due to increased sales of contract brands, a so-called bottler's profit, averaging approximately $1.50 on each case of bulk whiskey in addition to the usual profit earned by a distributor on the sale of bottled whiskey. True, there was evidence relating to the anticipated bottler's profit, and we have made a finding of fact that recognized that situation. But the weakness in petitioner's position is that the bottler's profit was in large measure illusory. The evidence reveals that much, if not all, of the bottler's profit was eliminated by deals which National and petitioner would enter into with liquor retailers in the course of their promotional efforts with the contract brands. Although a particular deal, providing for a specified price reduction per case to the retailer might be in effect only for a period

of from 5 to 30 days, the record makes it clear to us that such deals were recurrent and became a part of the permanent buying plan of the retailers. A retailer, anticipating his needs, would stock up on a particular brand during the period of a deal. He could then make substantial purchases of that same brand again when another deal was offered with respect to it at a future time. We are satisfied from the record that deals played a crucial part in the merchandising of the contract brands. Petitioner did not show how frequently deals occurred, or how much of the bottler's profit would be offset by such deals. In the circumstances, we do not have any confidence in petitioner's contention that it is entitled to reconstruction that contemplates a bottler's profit of about $1.50 a case. However, we do think that there was some residual bottler's profit, and in our reconstruction we shall give some, but not substantial, weight to this factor.

Taking into account all of the circumstances outlined above, and giving effect to all of the evidence, we conclude that petitioner is entitled to a constructive average base period net income in an amount equal to $10,000 more than its average base period net income computed without the benefit of section 722 of the Internal Revenue Code.[9]

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*

---

* Petitioner has founded its claim to relief under (b) (5), as well as (b) (4). However, it has not relied upon any facts or circumstances for its (b) (5) claim that were not also relied upon for its (b) (4), claim. In such circumstances, no additional relief is available under (b) (5). Cf. *Roy Campbell, Wise & Wright, Inc.*, 15 T. C. 894, 901–902; *Mitchell & Co.*, 20 T. C. 110.