UNITED MAIL ORDER HOUSE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 36864. Filed December 18, 1956.

*Kenneth Carroad, Esq., Theodore Propp, Esq.,* and *Henry B. Bobrow, Esq.,* for the petitioner.

*Emil Sebetic, Esq.,* and *James A. Glascock, Jr., Esq.,* for the respondent.

538

OPINION.

ARUNDELL, *Judge:* Petitioner contends that its average base period net income is an inadequate standard of normal earnings because of certain base period changes in the character of its business within the purview of section 722 (b) (4), Internal Revenue Code of 1939. These alleged changes consist of (1) moving its offices to a larger, new location, (2) acquiring new clients through contracts with former competitors, and (3) changing and enlarging its operations by providing new types of service for its clients.

Petitioner moved its offices from 1071 Sixth Avenue, New York City, to 225 West 34th Street, in January 1936. The new offices contain about double the amount of space of the old offices. Petitioner contends that the additional space resulted in an increased volume of resident buying business.

The additional office space undoubtedly afforded petitioner the means of expanding its business. However, proof is lacking that before the move the business was suffering because of any lack of space or that there was any increase either in gross business or in net income directly attributable to the use of the additional office space. The evidence is that the additional space was acquired for the purpose of making room for an export business, which, however, was not acquired. Neither is there any showing that the benefits from the move were not substantially reflected in petitioner's base period earnings. The move was made early in 1936. There is no support for petitioner's contention that the results of the move were not fully reflected in its operations until 1939.

Petitioner's service fees as resident buyer were considerably greater for a number of years before the office move than they were for several years afterwards. The 10-year, 1922–1931, average was in excess of $113,000, although the 1932–1935 average fell off to about $86,500. The fees amounted to $96,064.33 in 1936, $107,060 in 1937, $104,459.74 in 1938, and $120,989 in 1939. While, as shown, there was an increase in fees of approximately $10,000 a year in 1936 and 1937 following

the office move, there was a decrease of approximately $2,500 in 1938 compared with the previous year. This would indicate that the amount of petitioner's resident buying service fees was not dependent upon the amount of office space. On the evidence of record, we cannot find that the move to the new offices resulted in any substantial increase in petitioner's level of earnings. The change, therefore, is not such a change as would entitle petitioner to relief under section 722 (b) (4). See *Granite Construction Co.*, 19 T. C. 163; *Central Produce Co.*, 18 T. C. 267; *Toledo Stove & Range Co.*, 16 T. C. 1125; *Wisconsin Farmer Co.*, 14 T. C. 1021.

Petitioner claims that the contracts which it entered into with Charles A. Cook and Harry G. Flanagan whereby it acquired new clients and made certain changes in its operations were changes in the character of its business within the meaning of that portion of section 722 (b) (4) which defines as a change in the character of the business "the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished."

Assuming without deciding that the contracts entered into with Cook and Flanagan come within the qualifying provision of section 722 (b) (4), *supra*, such assumption, as will be shown later in this Opinion, will not help petitioner unless it establishes a constructive average base period net income under section 722 (a) of such magnitude as will produce an excess profits credit in excess of the credit allowed petitioner under section 714 of the 1939 Code.

Petitioner also claims that it had a "change in the character of the business" within the meaning of that term as used in section 722 (b) (4) by reason of the so-called C. M. D. and M. C. D. plans which it put into operation at Flanagan's suggestion while he was in petitioner's employment. This amounted to nothing more than charging the clients a separate fee for services in keeping their inventories at certain basic seasonal levels. It does not appear that these services required any substantial change in petitioner's operations or that they amounted to anything more than bookkeeping changes and the normal expansion of the business. Furthermore, we have no proof that the changes, whatever their nature, were made before the end of the base period as required of qualifying changes.

Other changes in character claimed by petitioner include the so-called R. A. D. and R. A. D. promotions services, the distribution to clients of the Fabric Book and Christmas catalog, the operation of the business called Sketches, and the so-called Sopic transaction.

The so-called R. A. D. and R. A. D. promotions services in which petitioner furnished some of its clients certain newspaper advertising

mats for small fees were even less important changes in petitioner's operations than were the C. M. D. and M. C. D. services. So, also, was the distribution to clients of the Fabric Book and Christmas catalog. At most, they were nothing more than minor additions to petitioner's regular services for its clients as a resident buyer and jobber. The statute was intended to afford relief only where there have been important changes which substantially affected the taxpayer's earnings. In *Avey Drilling Machine Co.*, 16 T. C. 1281, 1298, we said that "A change in character, within the intent of the statute, must be a substantial departure from the preexisting nature of the business." None of the changes claimed here was of such a nature.

Regarding the operation of the department of the business called Sketches, petitioner did not request any findings of fact with respect to this item in its proposed Findings of Fact. It does not contend that this was a new activity commenced during the base period but argues that this department was organized and expanded during the base period, so that the normal level of earnings was not reached until December 1939. It is enough to say that the record is wholly lacking in evidence of any reorganization or expansion of this phase of petitioner's business that could qualify as a substantial change in the character of the business.

In the so-called Sopic transaction which took place in February 1939, petitioner agreed to permit Sopic Trading Company to use its offices and facilities, to furnish the same type of services to foreign clients as petitioner furnished to its domestic clients. Petitioner had no foreign clients of its own. In consideration for the use of its office space and facilities, petitioner was to receive a flat fee of $840 a year, plus a percentage of the gross amounts received from these foreign clients. The total amount received by petitioner from Sopic under this agreement amounted to $433.02 in 1939.

Petitioner contends that under its arrangement with Sopic it must be regarded as having changed the character of its business either by entering into the export business or by partially absorbing a competitor's business. Petitioner seeks to include in its constructive income for each base period year the fixed annual fee of $840, plus an assumed additional income of $1,560 in 1936, 1937, 1938, and $1,126 ($1,560 less $433.02) for 1939. We will assume that under its contract with Sopic for sharing office space and facilities for certain fees the petitioner made changes in the operation of its business within the meaning of section 722 (b) (4). Petitioner had not previously operated under any such plan. We may assume, further, that this change increased petitioner's potential gross income in the approximate amount claimed by the petitioner. However, these proposed additions to constructive base period income are at best gross income

and not net income. This is also true of the adjustments claimed on account of the other alleged changes, with exception of the fees charged for the Fabric Book.

We have carefully considered all of the claims made by petitioner and we think petitioner has failed to show that if all of these alleged changes had been made 2 years earlier its earning level at the end of the base period would have been substantially larger than it was. In order for petitioner to obtain any relief, it would have to establish a constructive average base period net income of such magnitude that 95 per cent thereof would exceed its excess profits credit, computed under the invested capital method, for each of the excess profits tax taxable years, ranging from a low of $10,287.62 in 1943 to a high of $11,879.60 in 1945. *Green Spring Dairy, Inc.*, 18 T. C. 217; *Godfrey Food Co.*, 18 T. C. 1083; and *Gillen & Boney*, 27 T. C. 242. Petitioner's actual average net income for the 18-year period from 1922 to 1939, inclusive, was $3,260.02. For the base period years it had an actual average net loss of $1,194.82. Its actual excess profits net income for the last year of the base period, after these alleged changes had been made, was $3,815.75, or about 2.65 per cent of its gross. Notwithstanding these actual happenings, petitioner contends that if the alleged qualifying changes mentioned above had been commenced 2 years sooner, its constructive average base period net income would have been at least $40,000. It arrives at this average figure by reconstructing for each of the base period years a certain amount of additional gross income without reconstructing any expenses in earning such additional income. As indicated above, the actual net for 1939 was less than 3 per cent of the gross income. This percentage of $40,000 would amount to about $1,200 which is a long way from an amount 95 per cent of which would exceed the excess profits credits allowed under the invested capital method.

Since the invested capital credit amounted to over $10,000 in each of the taxable years, petitioner would need to convert its average base period loss of approximately $1,194 into a constructive average base period net income greater than $10,900. We cannot find on the evidence of record that reasonable adjustments of base period net earnings for any or all of the alleged changes claimed by the petitioner would produce a constructive average base period net income of such proportion.

Respondent's action in disallowing petitioner's claims for relief is therefore sustained.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*