*Decision will be entered under Rule 50.*

### PIED PIPER SHOE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 30731.   Filed May 28, 1957.

*Kenneth K. Luce, Esq., George D. Spohn, Esq.,* and *William C. Brunsell, Esq.,* for the petitioner.

*Julian L. Berman, Esq.,* for the respondent.

508

512

## OPINION.

KERN, *Judge:* In this proceeding the petitioner contests the respondent's disallowance of its application for relief under section 722 of the Internal Revenue Code of 1939. Specifically, the petitioner invokes subparagraphs (b) (1), (b) (2), (b) (4), and (b) (5) of section 722.[2]

The petitioner's claim for section 722 relief is based substantially on the following summary of facts: Petitioner's predecessor corporation, hereinafter referred to as Marathon, was a manufacturer of high-quality and high-priced children's and ladies' shoes with certain outstanding features such as a patented insole designed to achieve greater flexibility in children's shoes. The petitioner was organized in 1934 to acquire the assets of Marathon in that year. In connection with the liquidation of Marathon and incident to the organization of petitioner, the management and supervision of its business was assigned to another shoe manufacturer, Huth & James, which was a substantial stockholder at that time in petitioner and which was represented by some of its officers on petitioner's board of directors, for a period to last from May 1, 1934, until June 15, 1936. This contract was ratified by appropriate corporate action on the part of petitioner. Huth & James instituted many changes in the petitioner's operations, including the discontinuance of the use of the patented insole process which was an important feature of the high-quality shoe previously

---

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer,

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

*        *        *        *        *        *        *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, * * *

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

manufactured by Marathon. These and other changes in policies resulted in the lowering of the price and quality of the shoes produced by the petitioner with the consequence that a number of the old customers of Pied Piper shoes became dissatisfied with the petitioner's products and ceased to do business with the petitioner. Huth & James terminated the management contract prematurely on February 9, 1935, because of the petitioner's deteriorating business condition. After a period of internal reorganization during which the plant was shut down twice, a different management took over the active conduct of petitioner's business and generally followed the former Marathon policies and methods of production, including the use of the patented insole process and high-quality construction features, materials, and workmanship. The new management increased the price of its shoe products as rapidly as conditions would permit and tried to produce shoes comparable to those produced by Marathon. The new management believed that the petitioner's success was dependent on rebuilding the Pied Piper shoe reputation.

To prevail in its claim for relief under section 722 (b) (1), it is mandatory for petitioner to show (1) that its normal production output or operation was interrupted or diminished in the base period because of the occurrence, either during or immediately prior thereto, of an event unusual and peculiar in the experience of the taxpayer, and (2) that the average base period net income was an inadequate standard of its normal earnings. The petitioner also claims relief under subsection (b) (2), whereby it must show that its business was depressed by temporary economic circumstances. In *Toledo Stove & Range Co.*, 16 T. C. 1125, 1130, we said:

This Court has heretofore approved in *Foskett & Bishop Co., supra*, the following provision of the Bulletin on Section 722 of the Internal Revenue Code, part III, page 16, issued by the Commissioner on November 2, 1944:

> The term "economic" includes any event or circumstance, general in its impact or externally caused with respect to a particular taxpayer, which has repercussions on the costs, expenses, selling prices, or volume of sales of either an individual taxpayer or an industry. Thus, not every event or circumstance which has an adverse effect on a taxpayer's profits may serve to qualify that taxpayer for relief under subsection (b) (2). First, the temporary and unusual character of the circumstance or event must be clearly established. Second, the cause of the temporary depression must be shown to be external to the taxpayer, in the sense that it was not brought about primarily by a managerial decision. A taxpayer cannot qualify for relief under subsection (b) (2) because its earnings were temporarily reduced in the base period in consequence of its own business policies, internally determined. * * *

"In general, (b) (1) deals with physical events which produce the required consequences, whereas (b) (2) deals with economic events

which cause the consequences involved." *Southern California Edison Co.*, 19 T. C. 935, 980.

We do not agree with the petitioner that these events or circumstances fall into the category of physical or economic circumstances as are contemplated by either (b) (1) or (b) (2). The closing down of the petitioner's plant at two different times during the reorganization which took place following the exit of the Huth & James management is not the type of physical event contemplated under subsection (b) (1). The regulations enumerate fires, floods, and explosions as being the type of events contemplated by subsection (b) (1). Regs. 112, sec. 35.722–3 (a). Here the closing of the plant was an act of the petitioner's management. At most it could be said to have been brought about by the reorganization of management and policy forced by the departure of Huth & James. This is not a physical event such as would qualify the petitioner for relief under section 722 (b) (1).

The economic events or circumstances which caused the depression in business during the base period must be shown to be "external to the taxpayer, in the sense that it was not brought about primarily by a managerial decision. The taxpayer cannot qualify for relief under subsection (b) (2) because its earnings were temporarily reduced in the base period in consequence of its own business policies, internally determined. * * *" Bulletin on Section 722 of the Internal Revenue Code issued by the Commissioner on November 2, 1944. The "statute was not designed to counteract errors of business judgment or to underwrite unwise business policies." *Granite Construction Co.*, 19 T. C. 163. Since both the unusual events relied upon by petitioner under (b) (1) and the temporary economic circumstances or events relied upon by petitioner under (b) (2) were results of its own internal business policies, petitioner is not qualified for relief under either of those subsections of section 722.

Petitioner seeks to avoid the result which we have reached with regard to the availability to it of subsections (b) (1) and (b) (2) by arguing that the depression of its business during the base period was caused by the Huth & James management of its business; that this management was illegal and void since the contract under which it exercised this management deprived petitioner's board of directors of its managerial function; and that, since the acts of the Huth & James management did not therefore represent the policies or decisions of petitioner, they must be considered as "external" so far as the petitioner was concerned.

We do not believe that the Huth & James management contract was illegal under the circumstances of the instant case. It was for

a comparatively short term, it put the temporary management in the hands of an experienced and successful shoe company which held a substantial stock interest in petitioner, its terms were in no way onerous with regard to petitioner, and it was unanimously ratified by all of petitioner's incorporators and subscribers to its capital stock at the time of its organization meeting. Cf. *Sherman & Ellis, Inc.* v. *Indiana Mutual Casualty Co.*, (C. A. 7, 1930) 41 F. 2d 588. Its validity has never been questioned, directly or indirectly, since petitioner's new management took over the conduct of its business in 1935. It is stipulated by the parties that "The management contract [with Huth & James] was ratified by Petitioner * * *."

Even if this management contract were illegal in the sense that it could not be enforced or could be successfully questioned in a stockholder's suit, it is nevertheless an "illegality" of petitioner's own choosing adopted by all of its incorporators and stockholders at the very meeting of petitioner's organization. We are unable to see how this management thus chosen can be considered as an external circumstance beyond petitioner's control.

The petitioner next claims relief under subsection (b) (4). To be entitled to relief under this subsection the petitioner must show that it "either during or immediately prior to the base period, commenced business or changed the character of the business, and the average base period net income does not reflect the normal operation for the entire base period of the business." The respondent concedes, and we agree, that there was a change of management when the new management took over operation of the business after Huth & James terminated its management contract in 1935. However, respondent contends that this did not occur "immediately prior to the base period."

Assuming the qualification of petitioner for relief under section 722 (b) (4), before petitioner can be granted relief under section 722 it must show, pursuant to section 722 (a), "what would be a fair and just amount representing normal earnings * * *." Unless and until it proves a constructive average base period net income which will provide income credits greater than the invested capital credits actually used by it under section 714, no relief will be forthcoming here under section 722. *Hugo Brand Tannery, Inc.*, 20 T. C. 990, 998; *Green Spring Dairy, Inc.*, 18 T. C. 217, 237.

Petitioner in its attempt to prove what would be a fair and just amount representing normal earnings has presented voluminous and elaborate testimony. Its validity rests upon one basic assumption. Petitioner's position on this point is indicated by the following quotations from its brief:

The basic assumption underlying petitioner's reconstruction, as has been explained above, is that if the damage to petitioner's product reputation and sales organization which resulted from Huth & James' period of operation and persisted throughout petitioner's base period is eliminated from consideration, then petitioner during its base period would have maintained the same relative position in the infants', misses', children's and growing girls' shoe market that its predecessor, Marathon, held in the period prior to May 1, 1934.

\* \* \* \* \* \* \*

With respect to section 722 (b) (4), if the Huth and James period of operation and the reorganization that followed are pushed back two years to 1932 and 1933, then petitioner by the end of its base period, November 30, 1940, would have overcome the damage to its product reputation, rebuilt its sales organization and regained the relative industry position held by Marathon prior to the Huth and James period of operation.

\* \* \* \* \* \* \*

If the Huth and James period of management and the following reorganization of the business are pushed back two years to the years 1932 and 1933, there is much to support the conclusion that with two more years in which to recover its position, petitioner would have overcome the damage to its product reputation, rebuilt its sales and dealer organization, and regained Marathon's relative position in the industry by November 30, 1940, at the end of its base period. The year 1933 was the depth of the depression and markets at that time were more disorganized than they were two years later. Obviously, the damage to product reputation would not have quite the same effect at the depth of the depression as it did have two years later. Considering this factor, together with the fact that petitioner made a substantial gain in the last year of its base period, it is reasonable to assume that petitioner by the end of its base period would have regained the position in the children's, misses' and growing girls' shoe market held by Marathon prior to May 1, 1934 with two more years in which to overcome the handicap of its damaged product reputation and disorganized sales force and dealer organization.

The reasonableness of petitioner's assumption is strengthened by reference to petitioner's corporate income tax returns for the fiscal years ended November 30, 1941, 1942 and 1943, introduced in evidence as Exhibits 76, 77 and 78. Compared with the figures for the last base period year ended November 30, 1940 (Stipulated Exhibit No. 15-0), these exhibits demonstrate that petitioner did actually recover after two more years. And the Court should take judicial notice that children's, misses', infants' and growing girls' shoes are not items customarily sold to the government or the armed forces. In other words, war orders were not involved. \* \* \*

We are unable to agree with petitioner's "basic assumption."

Petitioner's new management which took over the conduct of its business on September 30, 1935, not only was faced by the problems created during the management of Huth & James and those arising as a result of the tired management of Marathon during the years when Pentler and Short were seeking to liquidate their interests, but it was also faced by the problems necessarily faced by the small group of manufacturers of infants', children's, misses', and growing girls' shoes in the high-quality and high-priced range, of which petitioner

was one, during a time immediately following the most severe economic collapse in our history. During this great depression, it is natural to assume, and the entire record herein indicates, that consumers became extremely price conscious and became more interested in buying merchandise attractive by reason of price than merchandise attractive by reason of superlative quality. It is also obvious from the record that buying habits in the shoe business are slow to change. Even though we were entitled to consider post-base period events, it would be our judgment that not until the national economy was stimulated by armament production and preparations for war in 1940 and 1941, and more people had appreciably more money to spend, would it be natural for such a change in buying habits (with greater consideration being given to quality than to price) to begin. But until then the manufacturers of high-quality and high-priced merchandise would be at a disadvantage as compared with manufacturers of similar merchandise which was low priced even though low quality.

There is nothing in the record to show how petitioner's competitors in the small group who manufactured similarly high-quality and high-priced shoes were faring in comparison with the shoe industry as a whole; but the record does show that petitioner, even 5 years after the termination of the Huth & James management, was obtaining a smaller proportion of industry business than ever before.

In the absence of information concerning the proportion of industry business obtained by petitioner's competitors, we must conclude that a large part of petitioner's economic problems was more fundamental than that arising from the Huth & James management, and that even though this management was pushed back 2 years there is no practical probability shown by the record herein that petitioner's earnings and profits would have reached a figure by November 30, 1940, which would support a reconstructed average base period net income for petitioner, resulting in credits available to it in excess of those allowed to it under section 714.

Since we do not agree with the "basic assumption" of petitioner's reconstruction, it is unnecessary for us to consider the various attacks made by respondent on the statistical steps taken by petitioner in working out the final figures submitted as its constructive average base period net income.

Petitioner does not seriously press its claim to relief under section 722 (b) (5). Obviously, it is not entitled to relief under this subsection. See *Granite Construction Co., supra; Mitchell & Co.*, 20 T. C. 110.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*