EMPORIUM WORLD MILLINERY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 51169.    Filed April 30, 1959.

*Fred R. Tansill, Esq.*, for the petitioner.
*Emil Sebetic, Esq.*, for the respondent.

294

296

## OPINION.

OPPER, *Judge:* Petitioner's contentions are that its base period net income was depressed because of an unusual and temporary economic

circumstance identified as "hatlessness," which entitles it to excess profits tax relief under section 722(b)(2), I.R.C. 1939.[1] Petitioner proposes to correct this abnormality by restoring to base period income that portion of its advertising expenses for each of the base period years which it attributes to the cost of combating hatlessness. The resulting constructive average base period net income under the proposed adjustment is $111,527.11.

In our opinion the evidence fails in several respects to support petitioner's contentions.

Petitioner's average base period net income is abnormally low only when compared with the high income years from 1922 to 1927, inclusive, and those after 1942. The average earnings for the pre-base period years 1927–1935 was $33,844.15 as against actual average base period income of $37,679.78. The allover 1927–1942 average was only $40,157.72, which is below the excess profits credit figure of $41,970.73 computed under section 713(f), I.R.C. 1939.

But even assuming that petitioner's base period earnings were depressed, the evidence is far from convincing that the major cause was hatlessness as petitioner contends. There is evidence that in the base period years there were other factors adversely affecting the whole millinery industry, including the depression, labor troubles, cutthroat competition, low per unit prices, and increasing costs of operation. Petitioner, in its brief, speaks of a "multiple causation for 'hatlessness.'"[2] This suggests that hatlessness was not a prime cause for

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

*      *      *      *      *      *      *

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

[2] "* * * Against this panorama of style and style change, there emerges a picture of multiple causation for 'hatlessness' which became perceptible in the early Nineteen Thirties.

"Perhaps the most fundamental and all pervading factor was the general depression itself commencing in 1929 and plummeting to a low in 1932. The mores of a depression-bound population rebelled at the expenditure of scarce money for 'luxuries.' No doubt unemployment, reduced incomes, and retrenchment thinking all were factors in the picture. Still other factors stemming from the depression must not be overlooked, for they too are elements in the picture." (Petitioner's brief, p. 72.)

women not spending as much for hats but was itself the result of other causative circumstances. It may be oversimplification to say that women did not buy hats because they did not wear hats. To satisfy the statute we should look further to find the reason why they did not buy as many or as expensive hats and the real cause of the lack of dollar-volume sales.

The evidence does not show the unit volume of hat sales before 1937 but for the 3 last base period years the number of hats sold increased substantially from year to year. The per capita sales are not given before 1938, but even they show a slight increase between 1938 and 1939. In any event, there is no possible means of determining on the evidence of record what dollar amount of petitioner's theoretical unrealized base period income may reasonably be attributed to any hatlessness.

Petitioner's proposed reconstruction plan of restoring a portion of the advertising costs [3] to base period income is wholly unacceptable.[4] It of course presupposes that some ascertainable amount of such advertising expenses was incurred in combating hatlessness. There is no foundation in the record for such a calculation. Aside from the irrelevance of such a "managerial decision," see *Granite Construction Co.*, 19 T.C. 163, *Hearn Department Stores, Inc.*, 23 T.C. 266, there is no showing that advertising was intended to or did check hatlessness. The evidence is that most of petitioner's advertising was in the newspapers. Presumably those advertisements were presented in the usual style and price formats. There is no evidence that any substantial amount of petitioner's advertising was directed against hatlessness. It could have been, and presumably was, intended to increase sales like any other advertising, although for all that appears it could equally have been directed toward obtaining higher prices or moving lower cost merchandise. Any direct attack against hatlessness apparently was left to the special committee of the Millinery Stabilization Commission, Inc.

So far we have discussed only the factual questions presented. As a matter of law, petitioner has the further burden of establishing that its business was depressed in the base period "because of temporary economic circumstances unusual in the case of such taxpayer." *Fish Net & Twine Co.*, 8 T.C. 96; *Lamar Creamery Co.*, 8 T.C. 928; *Wadley Co.*, 17 T.C. 269; *Mitchell & Co.*, 20 T.C. 110.

Assuming again that hatlessness may be accepted as an economic circumstance or event, the evidence is conclusive that it was not un-

---

[3] This is because "the burden of proving depression of sales would be too difficult, the problem being complicated by the number of outlets operated and their wide geographical dispersion." (Petitioner's brief, p. 79.)

[4] Even if this were more adequately demonstrated, it would fall more nearly in the province of section 721 than of 722.

usual nor temporary.  See *Acme Breweries*, 14 T.C. 1034; *Packer Publishing Co.*, 17 T.C. 882, revd. (C.A. 8) 211 F. 2d 612; *Brown Paper Mill Co.*, 23 T.C. 47, appeal dismissed (C.A. 5) 255 F. 2d 77, certiorari denied 358 U.S. 906.  Hatlessness is clearly a function of style, or fashion, an element that is always present in the clothing industries, and is no more entitled to be viewed as unexpected or unusual than normal competition.  See *Lamar Creamery Co.*, *supra; Constitution Publishing Co.*, 23 T.C. 19.

The hatless trend had begun to exert a significant effect on the industry at least as early as 1931, 5 years before the base period and, as we have seen, has continued up to the present time and certainly throughout the tax years.  And if we are permitted to look beyond the base period, we note that the substantial and continuous increase in dollar sales and profits after 1940 was due entirely to increased prices through 1944 and not at all to any increase in unit sales per capita in the entire country, which remained static or actually declined; although of course petitioner's considerable expansion in the number of its retail outlets during these years presumably raised its own unit sales and its share of the retail market.[5]

The per capita sales of hats in 1947 and 1948, the latest years for which figures are available, was less than for the base period years, although the per capita expenditures for millinery and the dollar value of sales almost doubled.[6]  What is indicated is that there has been no general decline in hatlessness but that prosperity has caused an increase in average hat prices and the industry, including both the manufacturers and the retailers, has learned how to prosper in spite of a decline in per capita unit volume.  While, as petitioner contends, hatlessness may have ceased to cause distress after the 1930's, it has not ceased to exist nor has it even diminished.

For the reasons discussed, we think that respondent correctly disallowed petitioner's claims for excess profits tax relief under section 722.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*

---

[5] "This [increased outlets and greater advertising] amounted to enlarging—not the market—but petitioner's share of the existing market."  (Petitioner's brief, p. 80.)

[6] Petitioner's expert witness testified: "It is clear that unit volume in the industry during the last 22 years has not kept abreast of population increase. * * * It has, on the contrary, lagged far behind it."